**HUMBLE OIL & REFINING CO. v. WRATHER et al.**

No. 9642.

Court of Civil Appeals of Texas. Austin.

Oct. 1, 1947.

Rehearing Denied Oct. 22, 1947.

Rex G. Baker, R. E. Seagler, and Nelson Jones, all of Houston, and J. A. Rauhut, of Austin, for appellant.

Wheeler & Wheeler, by J. W. Wheeler, of Austin, for appellee John Wrather.

Price Daniel, Atty. Gen. of Texas, and Elton M. Hyder, Jr., Asst. Atty. Gen., for appellees.

HUGHES, Justice.

This is a Rule 37 case.

On December 6, 1940, appellee Railroad Commission of Texas granted the application of appellee John Wrather for a permit to drill well No. 4 on the "J. T. Butts Heirs 0.4 acres" in the East Texas Oil Field, in order to prevent physical waste and confiscation of property.

Appellant, Humble Oil & Refining Company, protested the granting of such permit and filed this suit for its cancellation,

The well having been drilled at the time of trial, appellant, by amended pleadings, asked for an injunction enjoining production therefrom. Trial was without a jury. Judgment was rendered that appellant take nothing by its suit, from which this appeal was taken.

Findings of fact and conclusions of law were neither requested nor filed.

Questions presented by the parties for our decision are:

1. Does appellant show sufficient interest in the controversy to entitle it to maintain this suit under Art. 6049c, Sec. 8, Vernon's Ann.Civ.St.

2. Did the trial court commit error in receiving in evidence the transcript of the hearing before the Railroad Commission?

3. Did the trial court err in sustaining exceptions to appellee Wrather's pleading wherein it was alleged that on December 9, 1940, permits were granted by the Railroad Commission authorizing wells 7-16 to be drilled on the Pace-Elder 1.4-acre tract lying immediately south of the Wrather tract; that suit attacking the validity of these permits was filed by appellant, and settled in consideration of $1,000 paid appellant for each permit, and that appellee Wrather did not drill the well under the permit here involved until after the settlement of such suit?

4. Is substantial evidence shown to the effect that the drilling of well No. 4 was necessary to prevent confiscation of property?

5. Is substantial evidence shown to the effect that the drilling of well No. 4 was necessary to prevent physical waste?

1. Sec. 8 of Art. 6049c, Vernon's Ann. Civ.St., provides that "any interested person affected by the conservation laws of this State relating to crude petroleum oil or natural gas, and the waste thereof, including this Act, or by any rule, regulation or order made or promulgated by the Commission thereunder, and who may be dissatisfied therewith," shall have the right to sue.

It is shown that appellant owns approximately 10% of the entire East Texas Oil Field. That well No. 4, if allowed to pro-

duce, will ultimately yield 100,000 barrels of oil. That all of the oil in this field is contained in common reservoir. The net loss of appellant would thus be 10,000 barrels. In addition, it is an established fact that the water pressure in this field is exerted from west to east and that as oil is withdrawn water replaces it so that some of the leases to the west, including some of appellant's leases, will never recover the oil originally in place because of the migration of this oil to the east. The faster the withdrawal of oil, the faster is the encroachment of water. Appellant's Dura Thomas lease lies 408 feet northeasterly from the Wrather No. 4 well; it has other leases from 2,000 to 14,000 feet which lie generally west of this well. Other effects, such as uneven water encroachment, entrapment of oil, earlier escape of gas from solution and shortened flowing life of wells, all of vital concern to appellant, are shown to result from congested drilling conditions.

It is to be noted that the Railroad Commission gave appellant notice of the application for the permit involved, indicating recognition of its interest.

It is argued that the trial court's judgment being general and against appellant, and in the absence of findings of fact, is tantamount to a finding that appellant was not an interested party. This is untenable for the reason that in such event the trial court should have dismissed the suit and should not have rendered a take-nothing judgment.

We are of the opinion that appellant has shown a real and substantial interest in the controversy sufficient to authorize it to maintain this suit, and appellees' points to the contrary are therefore overruled.

2. Appellant urges as error the reception in evidence of the transcript of the hearing before the Railroad Commission. Appellees assert there was no error in this respect but even so the error was harmless. In view of our disposition of this case we agree with appellees that such error, if any, was harmless.

3. We have stated above the substance of appellee Wrather's pleadings to which the trial court sustained exceptions. The matters alleged all occurred subsequent to the order of the Commission granting the permit to drill well No. 4. The validity of this permit must be tested by the conditions existing at the time it was granted. Railroad Commission v. Magnolia Petroleum Co., 130 Tex. 484, 109 S. W.2d 967; Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73.

This point made by appellee Wrather is therefore overruled.

4. That the permit for well No. 4 should be upheld on the ground that it was required to prevent the confiscation of property is based upon the contention of appellee Wrather that the 0.4 acre J. T. Butts Heirs Tract is a separate drilling unit. Appellant takes the position that 0.4 acre was voluntarily severed from a larger tract, in violation of the Railroad Commission rule prohibiting the creation of a separate drilling unit in such manner.

This question depends upon the identity of J. T. Butts and J. A. T. Butts as the same person.

Appellee Wrather's proof that J. T. and J. A. T. Butts were different persons consists of the following:

(a) Appellee Wrather testified:

"Q. Some contention is being made here that this lease is a subdivision off of the lease to the north and east of this 0.4 of an acre, where J. A. T. Butts gave a lease to Carl Calloway. To your knowledge were J. A. T. Butts and J. T. Butts one and the same person? A. I didn't consider them that. As far as I know, they were two different people, is what I am trying to say."

(b) The fact that J. T. Butts applied for and was granted a permit to drill well No. 1 on this 0.4 acre tract.

The following excluded evidence:

(c) Paragraph 3 of a pleading filed by appellant in a suit against the Gold Star Oil Company in which it alleged that on September 26, 1931, J. A. T. Butts conveyed to Carl Calloway an oil lease on 1.1 acres of land now known as the Butts Heirs Fee Tract in the Mary Van Winkle Survey in Gregg County, which entire lease was as-

signed to the Gold Star Oil Company October 7, 1931, which tract was capable of development for oil and gas as a single tract and was so developed when Gold Star procured a permit for and drilled well No. 1 on the entire 1.1 acres. Gold Star thereafter conveyed parcels of such 1.1 acres so that on March 16, 1939, it retained the leasehold on approximately 0.4 of an acre thereof.

Appellant's proof that J. T. and J. A. T. Butts were identical is as follows:

(a) Deed from B. F. Hard et ux. to J. T. and Amanda I. Butts, dated February 4, 1901.

(b) Deed from J. S. King et ux. to J. T. Butts, dated July 29, 1913.

(c) Deed from J. A. Northcutt et ux. to James A. T. Butts and wife, A. I. Butts, dated October 7, 1889.

(d) Deed from New York and Texas Land Company to James T. Butts and wife, Amanda I. Butts, dated May 25, 1900.

(e) Deed from James T. Butts and wife, Amanda Butts, to Dozier Skipper, dated September 30, 1905.

(f) Oil and gas lease from J. T. and Amanda I. Butts to Virgil Pearson, dated October 28, 1932.

(g) Deed from J. T. Butts and wife, A. I. Butts, to Trip Elder, dated October 16, 1928.

(h) Oil and gas lease from James A. T. Butts and wife, A. I. Butts, to Carl Calloway, dated September 26, 1931.

(i) Deed from J. T. Butts and wife, Amanda Butts, to J. A. Butts, dated February 27, 1933. The land described in this deed is a portion of the land described in deed from Northcutt to James A. T. Butts and wife, A. I. Butts ( (c) above).

(j) Deed from J. A. Butts and wife, Lessie Butts, and J. T. Butts and wife, A. O. Butts, to Trip Elder, dated February 2, 1924.

(k) Deed from James T. Butts and wife, Amanda Butts, to S. L. and J. F. Heard, dated January 14, 1931.

(l) Deed from James T. Butts and wife, Amanda Butts, to Mrs. Ella and George Culver, dated September 30, 1905.

(m) Affidavit of Frank Elder, which has been of record in the Deed Records of Gregg County since December 18, 1931, reciting, in part, that affiant had known James A. T. Butts personally for more than 40 years and that he was familiar with the tract of land known as the J. T. or James A. T. Butts homestead lying in the town of Kilgore, and that J. T. Butts and James A. T. Butts was one and the same person; that James A. T. Butts discontinued the use of the initial "A" because of the similarity between his name and the name of his son, J. A. (Jimmie Arthur) Butts.

We are of the opinion that the above evidence was insufficient to raise the issue that J. T. Butts was a different person from James A. T. Butts. Appellee Wrather's evidence in Item (b) and the proffered evidence in Item (c) throw no light at all upon this question. Appellee Wrather professed to have no knowledge either way upon the subject. He made no positive statement of separate identities. He gave no testimony of personal knowledge or information acquired which would give any weight to his statement that he did not consider the two names to refer to the same person. His testimony is entirely lacking in probative force.

The deeds introduced by appellant, set out above, all describe land lying in the Mary Van Winkle Survey in Gregg County, and when platted on the ground show an irregularly shaped solid body of land within the Kilgore townsite.

The names used in the above deeds speak for themselves, and we direct specific attention only to these facts: James A. T. Butts and wife, A. I. Butts, were named as grantees in the Northcutt deed (c), yet a portion of the land described in this deed was conveyed to J. A. Butts and the grantors were J. T. Butts and wife, Amanda Butts (i).

The other instruments demonstrate, beyond doubt, that J. T. Butts and James T. Butts refer to the same person and that Amanda Butts, A. I. Butts, and Amanda I. Butts do the same. The only discrepancy as to Amanda being that in the deed described in (j) she is named as A. O. Butts. This is probably accounted for by her in-

ability to write and that a Southern pronunciation of "I" and "O" might sound very similar.

■ We consider the above instruments, together with their subject matter, sufficient to conclusively establish that James A. T. Butts and J. T. Butts refer to the same person. Any doubt as to this finding is completely removed by the affidavit of Frank Elder. Accordingly, we hold that the 0.4-acre appellee Wrather tract is not entitled to be considered a separate drilling unit, since it was severed from a larger tract subsequent to the effective date of the order of the Railroad Commission prohibiting such subdivisions, and that no confiscation of property is shown in so far as appellees' contention that the Wrather tract is a separate drilling unit is concerned.

■ 5. The permit and judgment of the trial court can only be upheld if there is substantial evidence of physical waste. The evidence shows:

The average density of wells per acre in the East Texas Field is one well on five acres. The drill density in the eight times rectangular area surrounding the Butts 1.14 acres (out of which the Wrather tract was carved) is one well for each 0.33 acre and the drill density for the eight times circular area is one well for each 0.34 acre. The drill density in the leases adjoining the Butts 1.14 acres is one well for each 0.55 acre. The drill density of appellant's Dura Thomas lease is one well for each 2.68 acres.

The drill density of the Butts' 1.14 acres, with twelve wells, is one well for each 0.09 acres. If this thirteenth well is approved the drill density will be one well for each 0.08 acre.

The Wrather 0.4 acre tract has three wells against which no attack has been made, which gives it a drill density of one well for each .133 acre. If this fourth well is upheld the drill density will be one well for each .1 acre.

The Butts 1.14 acres is in the each edge of the fairway, about 1½ miles from the east edge of the field, in a due easterly direction and is about one-half mile from the edge of the field in a southerly direction.

This places the tract about 8,000 feet east of water encroachment, the top of the sand in the Wrather 0.4-acre tract being about 145 feet above the original water level.

The Butts 1.14 acres originally had beneath it approximately 50,000 barrels of oil. It has already produced 483% of that amount and still has substantially the same amount of oil beneath it as was there originally.

The 0.4 Wrather tract originally contained about 18,000 barrels of oil. It has produced 389% of such amount and still has virtually the same amount of oil beneath it as it originally had.

Based upon a conservative estimate of 20 years as the future life of the field, and upon existing allowables, the Butts 1.14-acre tract will produce 2,810% of the oil originally in place beneath it, and the Wrather 0.4-acre tract will recover 2,024% of the oil originally in place beneath it.

These conditions are brought about because of the migration of the oil from west to east which is due to the pressure exerted by water encroachment from the west. The result of this is that as oil is withdrawn from such tracts located as the Butts tract, it is immediately replaced by other migratory oil. Leases to the west, however, suffer in proportion to the benefit held by the favored leases to the east and to such an extent that many of those western leases will never recover the oil which was originally in place.

Mr. Gordon Griffin, a petroleum engineer, testified for appellees that he had made a study of the wells on the Wrather 0.4-acre tract, and of the wells on adjacent leases to determine drainage advantage or disadvantage, and that primary importance had been given to the distance between such wells. Locations of various wells on adjoining leases were given, some of them being nearer to the common boundary line than were the wells located on the Wrather tract. That wells tend to drain to a point midway between. That this situation resulted in a drainage disadvantage to Wrather which required the drilling of well No. 4 to offset. He also testified that drilling in the Kilgore townsite was not uniform.

On cross-examination Mr. Griffin, being interrogated about his theory that wells tend to drain to or from a midway point, testified that there would be more acreage of others closer to Wrather's wells than there would be acreage of Wrather's closer to wells of others. He also testified that the area in which the Butts tract was located had not, in the past, lost any oil; that all oil withdrawn had been replaced by oil moving from the west side of the field; that the three Wrather wells, as of December 1940, would produce in the future far more oil than the Wrather tract originally had in place; that some of appellant's leases would not recover the oil beneath them; that leases five miles away from the Wrather tract would lose 20 barrels a day as long as Wrather's No. 4 produced such amount.

Further testifying, Mr. Griffin stated that the permeability of the sands in the vicinity of the Wrather tract is less than the average in the field and in that area a well will not drain as far radially as the average well in the field will drain, such fact being reflected in the potentials of the Wrather wells being about one-half of the average in the field. That because of these factors the drilling and production of oil from Wrather's No. 4 well would result in the recovery of oil which would not otherwise be recovered. The reason for this, Mr. Griffin stated, was that the closer you approach mining oil in place the greater the recovery in the field would be; that this would be true throughout the field; that the more wells drilled, the greater the recovery would be; that this would apply particularly up and down the structure where conditions of porosity and permeability similar to those under the Wrather tract existed. Further, that 100 wells would be sufficient to produce the oil from this 0.4-acre tract and that a like number of wells on each 0.4 of an acre similarly located on the structure would be required to extract all of the oil.

Mr. Griffin also testified that the Wrather wells, considering their position on the structure, would drain about one-half as much acreage as wells located on the structure where average conditions prevail.

As to variation in the sands, Mr. Griffin testified: "I would say that the sand does vary from well to well in most instances over the field." Also that in his opinion one well to 5 acres will drain the sand in this area as efficiently as one well to 10 acres where average conditions for the field prevail.

Appellee Wrather cites Trapp v. Shell Oil Co., Tex.Sup., 198 S.W.2d 424, as reflecting evidence similar to that found in this record and which is summarized above. The permit in the Trapp case was sustained. We find the facts in the Trapp case quite dissimilar from those found here. To demonstrate this we quote from page 435 of that opinion in 198 S.W.2d:

"Permittee introduced expert evidence summarized as follows in his application for writ of error: That if the Trapp tract is considered as a 1.94 acre tract, using the center of gravity eight times area which embraces nine wells on 15.55 acres outside the Trapp tract, the density of drilling was 1.72 acres per well as compared with the Trapp tract considered density of 1.94 acres per well. Considering the Trapp tract as 1.94 acres with the radius point the Trapp well No. 1, a ten acre circle embraces seven wells on 8.06 acres outside the Trapp tract, with a resultant density of 1.15 acres per well as compared to the permittee's tract density of 1.94 acres per well. That if the Trapp tract is considered as a 1.94 acre tract, with a radius point the Trapp well No. 1, a five acre circle embraces three wells on 3.06 acres outside the Trapp tract, with a resultant density of 1.02 acres per well. Considering the Trapp tract as a 2.25 acre tract, an eight times area circle encloses ten wells on 18 acres outside the Trapp tract, with a resultant density of 1.80 acres as compared to appellant's Trapp tract, with a density of 2.2503 acres per well. Considering the Trapp tract as 2.25 acres, a ten acre circle embraces seven wells on 7.8 acres outside the Trapp tract, with a resultant density of 1.1 acres per well as compared to permittee's tract with a density of 2.25 acres per well. Considering the Trapp tract as the same amount of acreage, a five acre circle embraces three wells on three acres outside the Trapp tract, with

a resultant density of one acre per well as compared to the Trapp tract, with a density of one well to two acres."

Later in the opinion the court held that Trapp had shown a good faith claim of ownership to "at least 1.77 acres and 1.94 acres."

The facts in the Trapp case, as to drainage, are, generally, just the reverse of those present here. Opinions of the experts, however, based upon such divergent facts, are just the same. The court in the Trapp case held the evidence to reasonably support the granting of the permit. Assuming, a we do, the correctness of this opinion, it necessarily follows that evidence of an opposite nature would not support the opinion of the experts given in this case, nor the action of the Commission and trial court based thereon.

Appellee Railroad Commission contends that the evidence in the case of Thomas v. Stanolind Oil & Gas Co., Tex.Sup., 198 S. W.2d 420, where a permit to drill a well to prevent waste was upheld, is identical with or less substantial than the evidence here. Mr. Gordon Griffin testified as an expert in that case, as set out on pages 421, 422 of the opinion in 198 S.W.2d, as follows:

"He gave it as his opinion that it was necessary that this fourth well be drilled on the 10-acre tract in order to give that tract an equal opportunity of producing its fair share of oil underlying the area; that the drilling of such fourth well will result in recovering a substantial amount of oil which would not otherwise be recovered from those sands; that the sands underlying this 10-acre tract are less permeable than those in the field as a whole and less permeable than the Dollahite lease adjoining it; that in his opinion the sand conditions underlying this area are different from those in the remaining part of the field and such conditions require more dense drilling in order to recover the oil in place than is required in the field as a whole; that on the 40 acres immediately adjacent to the 10 acres in question and consisting of four tracts of 10 acres each bounding it on each side there are 16 wells,

which is an average of four wells to each 10-acre tract; that this would be a comparable density to the density on the 10 acres if the fourth well were permitted to be drilled and to produce; that drilling had been concentrated around this 10-acre tract; that there are 19 wells in the eight times area, 16 of which are in the four times area; that all of the 16 wells are offset wells to the 10-acre tract; that normally, with 3 wells on that tract, there should be 12 offsets and with 4 wells thereon there should be 14 offsets."

The court then held that the density of wells in the eight times surrounding area was not conclusive on the question of waste and confiscation and it being shown that the density of a lesser surrounding area was greater than the density of wells on the tract in question upheld the permit granted by the Commission.

■ We do not consider the facts in the Thomas case comparable with those here presented. In that case an additional well was allowed which put applicant on a parity with his neighbors. In this case an additional well would merely enhance an advantage already enjoyed by appellee Wrather.

■ Conceding the truth of the testimony that drilling more wells will result in the recovery of more oil, this does not constitute physical waste. Trapp v. Shell Oil Co., Tex.Sup., 198 S.W.2d 424.

■ A careful consideration of the entire record has convinced us that there is no substantial evidence of unusual local conditions to support the permit for Wrather well No. 4 on the ground that it was necessary to prevent physical waste. The record affirmatively establishes that appellee Wrather, with three wells on his 0.4-acre tract, has, at least, a fair chance to recover his oil.

We, therefore, hold that this record does not reveal substantial evidence of confiscation of property or physical waste to have been in existence when the permit for Wrather well No. 4 was granted by the Railroad Commission. The judgment appealed from is reversed and judgment is

here rendered cancelling the permit for such well and granting an injunction to restrain production therefrom, as prayed for by appellant.

Reversed and rendered.