# NOVEMBER, 1948

### JOHN WRATHER ET AL V. HUMBLE OIL AND REFINING COMPANY.

No. A-1470. Decided June 23, 1948.
Rehearing overruled November 3, 1948.
(214 S. W. 2d Series, 112.)

*Price Daniel,* Attorney General, *Elton M. Hyder, Jr.,* Assistant Attorney General, for the Railroad Commission, and *Wheeler & Wheeler* and *J. W. Wheeler,* all of Austin, for Wrather, petitioners.

The Court of Civil Appeals erred in holding that the Humble Oil Company had a "real and substantial interest" in the controversy sufficient to authorize this suit, because its tract of land was not adjacent to that of permittee Wrather, and the evidence shows that said company would suffer no drainage, or if there should be any it would be so small it could not be measured. Mingus v. Wadley, 115 Texas 551, 285 S. W. 1084; Industrial Acc. Bd. v. Glenn, 144 Texas 378, 190 S. W. (2d) 805; Johnson v. King & Davidson, 64 Texas 226.

*Rex G. Baker, R. E. Seagler* and *Nelson Jones,* all of Houston, *Powell, Wirtz, Rauhut & Gideon* and *J. A. Rauhut,* of Austin, for Humble Oil and Refining Company, respondent.

MR. JUSTICE FOLLEY delivered the opinion of the Court.

This is a Rule 37 suit, brought by the respondent, Humble Oil & Refining Company, against the petitioners, John Wrather and the Railroad Commission of Texas, to set aside and enjoin further operation under the order of the Railroad Commission granting the petitioner, John Wrather, a permit to drill Well

No. 4 on a 40-acre portion of the Butts 1.14-acre tract, in exception to the 10-acre (660'-330') spacing rule applicable to the East Texas Field, which permit, dated December 6, 1940, recites that it was granted on grounds of preventing confiscation of property and waste. The trial court, in a trial without a jury, upheld the permit, but the Court of Civil Appeals set it aside and granted an injunction restraining further production from the well, which had been drilled upon the faith of the permit. 205 S. W. (2d) 86.

It was urged by petitioners in the courts below that the 0.4-acre strip was not a subdivision of the Butts 1.14-acre tract of which it was a part; but the Court of Civil Appeals held that the Wrather tract was severed from the larger tract subsequent to the effective date of the order of the Railroad Commission prohibiting such subdivisions, and thus it was not entitled to be considered as a separate drilling unit and that no confiscation of property was shown. The petitioners assign no error in this respect and have abandoned the confiscation theory. They continue to insist, however, that well No. 4 is necessary to prevent waste, and further assert that Humble has no real or substantial interest in the controversy sufficient to authorize it to maintain the suit within the meaning of Sec. 8 of Art. 6049c, V. A. C. S. The latter contention was overruled both in the trial court and the Court of Civil Appeals. We shall first direct our attention to this jurisdictional question.

■ The Court of Civil Appeals held that in the absence of findings of fact by the trial court no presumption prevails from the take-nothing judgment therein that respondent was not an interested party. We agree with that holding for the reason stated by that court, which was that if the trial court had concluded that Humble was not an interested party the proper judgment would have been to dismiss the suit. Thus if any presumption arises it is that the trial court found that the respondent was an interested party within the meaning of the statute. We shall therefore detail only the evidence tending to support the presumed finding that Humble was an interested party authorized to prosecute the suit.

The respondent owns what is known as the Dura Thomas lease which is not adjacent to the Butts tract but is 239 feet and 274 feet respectively from its nearest corners and 408 feet from the Wrather Well No. 4. The Dura Thomas lease lies north of the Butts 1.14 acres, and extends some farther east and a considerable distance to the northwest, to a lower structural

position than Wrather No. 4. Part of the Dura Thomas lease is within the eight-times circular area of the Butts tract. Humble also owns other leases situated to the west, northwest and southwest, known as the Knowles, Laird, Peterson, Crim and Strong, at distances ranging from 2000 or 3000 feet up to about 14,000 feet of the Butts tract. In fact, Humble owns approximately 10% of the entire East Texas Oil Field. It was shown that if Well No. 4 is allowed to produce it will ultimately yield 100,000 barrels of oil from the common reservoir of the field, which witnesses estimated would result in a net loss to Humble of 10,000 barrels. The water pressure in the field is from the west to the east. The drainage of oil from the west side is not limited to due west, but tends to fan out to the northwest and southwest, in the direction of the Humble owned properties. Those who are receiving the net loss from the production on the east side are those on the west, from the north end to the south end of the field, and the more wells drilled on the east side, the greater will be the drainage from them. On cross-examination of petitioners' own witness, Gordon Griffin, it was brought out that the Butts tract has been replenished with oil by drainage from the west side of the field, and that the faster it is withdrawn from the Butts tract the faster it will be drained from the west side; that the Wrather production causes a loss to leases situated five miles to the west, the entire width of the field at this point; that some of the Humble leases will never recover their recoverable oil in places, due to the eastward migration from them; that the owners who are receiving the net loss from this production on the east side are those on the west; and that the more wells drilled on the east side, the greater will be the drainage from them.

It was shown that the Wrather Well No. 4 would cause an additional drainage of 100,000 barrels to the Butts tract from other properties in the field during the next 20 years; that in the early part of this period this additional drainage will come primarily from leases west of the center of the field where oil is being replaced by water, and as depletion continues the area from which it will come will gradually move farther east, until at the last stages the drainage will be mostly from leases immediately surrounding the Butts tract; that thereby ultimately the Dura Thomas lease of Humble's would be adversely affected; that the effect of drilling and operating Wrather No. 4 will be to lower the pressure, cause uneven water encroachment, which results in entrapment of oil, and will shorten the flowing life of the wells and reduce rather than increase recovery from this area of the field.

■ Sec. 8 of Art. 6049c provides, in part, as follows:

"Any interested person affected by the conservation laws of this State relating to crude petroleum oil or natural gas, and the waste thereof, including this Act, or by any rule, regulation or order made or promulgated by the Commission thereunder, and who may be dissatisfied therewith, shall have the right to file a suit in a Court of competent jurisdiction in Travis County, Texas, and not elsewhere, against the Commission, or the members thereof, as defendants, to test the validity of said laws, rules, regulations or orders . . ."

By that statute the Legislature has limited the right to contest a rule, regulation or order of the Commission to be interested persons affected thereby. The petitioners make the contention that the right to sue is limited to adjoining or adjacent operators whose leases or holdings are subject to immediate net drainage. That contention is not justified either by the language of the statute or by the decisions on the subject.

In Empire Gas & Fuel Co. v. Railroad Commission, 94 S. W. (2d) 1240, writ refused, it was held that a lessee whose property was 430 feet from the permittee's lease, and nearly 900 feet from the involved location, was an interested party. Similar holdings were made in Rudco Oil & Gas Co. v. Gulf Oil Corporation, 169 S. W. (2d) 791, and in Potter v. Humble Oil & Refining Co., 173 S. W. (2d) 309.

The right to sue is not limited to holders of adjoining leases. In Magnolia Petroleum Co. v. Edgar, 62 S. W. (2d) 359, 361-362, writ refused, the court employed this language:

"* * * While the adjoining owners are most immediately interested, perhaps, owners more remotely situated in the same field are likewise interested, and that interest may or may not be dependent upon the proximity of their holdings to the lands sought to be drilled. And it would be impossible to define the limits of such interests in the vicinity of the lands involved. Obviously it could not be said that the adjacent owner, who might likewise own a narrow strip of land, would be so interested that he was a necessary party to such action, but that his adjacent owner, only a short distance further removed from the proposed well, was not a necessary party, though affected by the drilling of such well, or at least by offsets which might be necessitated by the drilling of such well. * * *"

We are dealing with a remedial statute which should be

liberally, though sensibly, construed. A liberal construction will do no violence in so far as public policy is concerned. It will not necessarily promote useless or baseless lawsuits for the simple reason that it would be in rare instances indeed that a party would choose to engage in tedious and expensive litigation where none of its property rights would be involved or affected by the judgment to be rendered. In any event, it is not necessary in such a case that the plaintiff show legal injury and damages in the sense employed in a damage suit or that plaintiff show the effect of the order with the exactitude required in a tort action, for the obvious reason that in a damage suit one of the primary issues is the extent of the injury and the amount of the damages, whereas in a suit under this statute the primary issue is the validity of the Commission's order. Although we should not countenance a suit by a mere interloper with no earthly interest in the litigation, or that of a party holding leases so far removed from the controversy that no substantial damage to him will result, the statute does include those whose lands and property rights will be materially affected either immediately or ultimately by the order, though their lands may not directly adjoin the tract involved. Under the above facts, we cannot say as a matter of law that the respondent has not shown sufficient interest to meet the requirements of the statute.

On the question of waste the facts of this case closely parallel those in the case of Hawkins v. The Texas Company, 146 Texas 381, 209 S. W. (2d) 338.

It is undisputed that the Butts 1.14 acres already had twelve wells, and Wrather No. 4 is the thirteenth on the entire tract and the fourth well on Wrather's 0.4-acre portion. It is 25 feet from the nearest line on the Butts tract, and at the time the permit was granted there were 37 wells within 330 feet of its location, whereas the applicable spacing rule provides that wells shall not be less than 330 feet from lines nor less than 660 feet from other wells.

The average density of wells per acre in the East Texas Field is one well on five acres. The drill density in the eight-times rectangular area surrounding the Butts 1.14 acres is one well for each 0.33 acre, and the drill density for the eight-times circular area is one well for each 0.34 acre. The density in the leases adjoining the Butts tract is one well for each 0.55 acre. The density of Humble's Dura Thomas lease is one well for each 2.684 acres. The density of Butts' 1.14 acres, with twelve wells,

is one for each 0.09 acre, and with the thirteenth well, Wrather's No. 4, is one well for 0.08 acre. The Wrather 0.4-acre tract, with three wells, has a density of one well for each .133 acre, and with the fourth well, Wrather No. 4, one well for each .100 acre.

The Butts tract is in the edge of the fairway and about 1 1/2 miles from the east edge of the field and about 1/2 mile from the southeast edge of the field. This area is about 8,000 feet east of water encroachment and the top of the sand in the Wrather 0.4 acre is about 145 feet above the original water level. The Butts tract originally contained about 50,000 barrels of recoverable oil in place, but at the date of the permit had produced 483% of that amount and still contained substantially as much oil as originally. The Wrather 0.4-acre portion originally contained about 18,000 barrels of recoverable oil, but had produced 389% of such oil. It was still full of oil at the date of the permit with an estimated future production life of 20 years. Based upon conservative estimates the existing wells on the Butts tract will produce, under present allowables, 2810% of the oil originally in place, and the existing wells on the Wrather tract will ultimately produce 2024% of the oil originally in place. The twelve pre-existing wells on the Butts tract had spacing advantages over adjacent wells to the southwest, north, northeast and east, and a net spacing advantage over all the surrounding tracts, there being more acreage of adjacent tracts nearer wells on the Butts tract than acreage of the Butts tract nearer wells of adjoining property.

Tom Shelby, geologist, and witness for respondent, testified that the producing sand in the area of the Wrather tract is a common reservoir with the remainder of the field; that the sand thickness of the Butts tract, as rated by the Commission, is 50 to 51 feet, and each existing well, and each new well, is given an allowable of 20 barrels per producing day; that the sand in this area is typical, as good or better than average for similar position on structure, there being nothing abnormal about it except that the Commission has rated it a little thicker than is ordinarily found this far east on the structure; that in the area of the location the sand is essentially the same, except that it thickens to the west and becomes thinner to the east, which is a normal situation; that the Butts tract, and the Wrather 0.4-acre portion, at the date of the permit were not suffering any net drainage or loss of oil, nor would they do so in the future if those conditions continued, but each had been and would continue to receive large amounts of drainage from others; that each tract had a net drainage advantage and possessed an op-

portunity of producing far in excess of the recoverable oil in place; that the Butts tract was approximately 52 times more densely drilled and consequently had 52 times greater allowable per acre than the average for the field, which enabled it to drain from less density drilled portions of the field far greater amounts than it would drain by natural migration but for this man-made difference in density and allowables; that there were enough wells on the tract to enable the Butts 1.14 acres to produce in the future over 23 times its recoverable oil in place, and to enable the Wrather 0.4-acre portion to produce over 16 times its recoverable oil then in place; that the well potentials in this area are lower than average for the field, but that in this type of reservoir it is normal to expect higher potentials and higher bottom-hole pressure farther west, nearer the water drive; and that the potentials of the wells on the Butts tract are similar to those of other tracts of the same structure position.

Riley A. Aucoin, petroleum engineer, and witness for respondent, testified that the Butts tract was not suffering net drainage at the date of the permit; that there was no shortage of wells to produce the recoverable oil, but that the area was overdeveloped; that there is nothing unusual in the sand condition in this area and nothing unusual in the sand conditions under the Wrather 0.4 acre to distinguish it from sand conditions in the area; that the sand is such that a well in this area can drain 10 acres; that the effect of drilling and operating Wrather No. 4 will be to further lower the pressure, add to the congestion of drilling and the unevenness of withdrawals, which will tend to cause waste in that it will cause water channeling, premature drowning of wells and uneven encroachment of water through fingering, which results in entrapment of oil, causing wells to go on the pump earlier.

Te petitioners rely wholly upon the testimony of their own witness, Gordon Griffin, who also is a petroleum engineer. He testified on direct examination that the permeability, porosity and potentials in the area involved are less than average for the field and that the sand varies in quantity from well to well; but on cross-examination he agreed with Humble's witnesses that the sand under the Butts tract is average for this position on structure, up and down the length of the field for that contour, and that the porrosity, pressures and potentials are as good as average for this position on structure; and that it is true generally in the field that the sand quality varies from well to well. He also testified on direct examination that Wrather's 0.4 acre, considered separately, has a spacing disadvantage to the south

or southeast which causes drainage from the 0.4 acre, and which would be eliminated by Well No. 4; but on cross-examination he said this was based on the theory that wells drained to the midway point between them, which, he added, is merely a spacing comparison and not the limit of how far they will drain. He further testified that the area in which the Butts tract is located had not suffered any net drainage because the oil was being replaced as fast as it was withdrawn; that at the date of the permit the Butts tract had produced more than the oil originally in place and that the existing wells would produce in the future more oil than was then in place; that Wrather's 0.4 acre with three wells was more densely drilled than the eight-times area or the average of adjoining leases, and the acreage of others which is closer to Wrather wells is greater than the Wrather acreage which is closer to the wells of others. On direct examination he gave his opinion that the closer you approach mining the oil, and the closer the wells are together, the more oil will be recovered; and that since Wrather No. 4 would shorten the distance between wells, it will produce some oil that would not otherwise be recovered. On cross-examination he stated that his opinion was not limited to this area, but is applicable to the entire field; that when he testified that Wrather No. 4 will increase recovery he did so on the "more wells, more oil" theory; that the drilling of a fourth well is not the limit of the wells needed on the 0.4 acre under that theory, but he would say Wrather and everyone else in the field should have 100 wells on each 0.4 of an acre, and it was on this basis that he said Well No. 4 is necessary to increase recovery; that in his opinion one well to 5 acres will drain the sand in this area as efficiently as one well to 10 acres where average conditions for the field prevail; that to drill the entire field to the density of the Wrather 0.4 acre with 4 wells would require 1,300,000 wells, and in his opinion all of that number of wells should be drilled, of which he would say 750,000 to 1,000,000 are just as necessary as Wrather No. 4; that if those wells were drilled the daily field allowable, at 20 barrels per well per day, would be 20,000,000 barrels, which was 40 times higher than it was at the date of the permit; that the available storage and pipeline facilities are insufficient to handle that much oil; that at such rate the remainder of the field's reserves would be produced in 125 days, and it would be impossible to build adequate pipeline facilities that quickly; that the cost of such additional wells would exceed the value of the oil reserves so that it would be impractical to drill them; and he finally added that he would not recommend that it be done.

At the conclusion of Griffin's testimony the resepondent moved to strike his opinion testimony that Wrather No. 4 is necessary to increase recovery, on the ground that such opinion was shown to be based upon the "more wells, more oil theory". The trial court overruled the motion.

■ The waste exception clause is Rule 37 has no application where ordinary or usual conditions prevail. To justify an exception under that clause it is necessary to show that the conditions affecting the drainage of wells on a particular tract are so peculiar, unusual and abnormal that it is removed from the same category of the surrounding area to which the general rule applies. When those peculiar and unusual conditions are found to exist in a localized area, exceptions may then be granted for the drilling of additional wells to the extent necessary to offset the abnormality and place it on parity, from the standpoint of efficient drainage, with other areas where the ordinary and usual reservoir conditions prevail.

■ The testimony of Griffin is based purely upon the "more wells, more oil" theory; and it is in substance and effect an attack upon the spacing rule of the Commission made applicable to the entire East Texas Field, and is not evidence that will support an exception to the rule on account of peculiar or unusual conditions in the tract involved. The "more wells, more oil" theory has been rejected repeatedly by the decisions of this State, which have held that in the absence of unusual circumstances no such evidence will justify or support an exception to prevent waste. Hawkins v. Texas Co., supra, and authorities cited.

This case may be distinguished from that of Thomas v. Stanolind Oil & Gas Co. 145 Texas 270, 198 S. W. (2d) 420, because in that case the facts established that conditions under the particular tract there involved were peculiar and different from those of adjacent tracts, and, further, the tract was at a density disadvantage from the immediately surrounding lands. That is not the case here.

From the facts of this case as a whole we conclude as a matter of law that the order of the Railroad Commission granting the permit is invalid because it is not "reasonably supported by substantial evidence," as that term has been defined by this courts.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered June 23, 1948.

Mr. Justices Simpson and Justice Hart dissented without written opinions.

Rehearing overruled November 3, 1948.

ON REHEARING.

MR. JUSTICE HART dissenting.

In my opinion the judgment of the District Court in favor of the defendants should be upheld upon the ground that it is supported by an implied finding of the District Court that the plaintiff had failed to prove itself to be an "interested person affected by" the Railroad Commission's order, as required by Section 8 of Article 6049c, Vernon's Annotated Civil Statutes.

This statutory provision is merely a restatement of the settled rule (which seems to be recognized in the majority opinion) that a person attacking the validity of a statute or an administrative order, before he can receive judicial relief, must show that he is substantially and directly affected by the statute or order. This rule is not one which affects the jurisdiction of the court or the legal capacity of the plaintiff to sue, but it is an essential element of the case which the plaintiff must prove to secure the relief which he seeks. Hence, a proper judgment for the court to enter upon the plaintiff's failure to prove himself to be so affected is a judgment for the defendants, such as was entered in this case, and not a judgment of dismissal. For example, a judgment for the defendants "denying the State all relief" rather than a judgment of dismissal, was approved by this Court in St. Louis Southwestern Railway Co. v. State, 113 Texas 570, 261 S. W. 996, 33 A. L. R. 367, in which it was held that the State had not shown itself to be sufficiently affected to be entitled to an injunction against the enforcement of the statute there involved. (For the terms of trial court's judgment, see the opinion of the Court of Civil Appeals, State v. St. Louis Southwestern Railway Co., 197 S. W. 1006, at page 1010.) See also Caruthers v. Harnett, 67 Texas 127, 2 S. W. 523. A proper basis for the court's judgment in this case, therefore, would be that the plaintiff has not shown such a direct and substantial injury to it as would entitle it to relief. This being true, and the court not having made express findings, under familiar rules we must presume that the District Court made such an implied finding and we must look to the record only for the

purpose of determining whether there is evidence to support such implied finding. The record shows that the witness for the permittee testified that the plaintiff's leases would not be affected by the production from this well and the testimony of one of the plaintiff's witnesses would sustain the conclusion that the injury, if any, would be speculative. Hence there is evidence on which the trial court's judgment can be sustained, and in my opinion the action of the Court of Civil Appeals in reversing this judgment is erroneous.

Simpson and Taylor, Associate Justices, join in this dissent.

Opinion delivered November 3, 1948.