**EXXON CORPORATION, Appellant,**

v.

**The RAILROAD COMMISSION of Texas et al., Appellees.**

**No. B–7288.**

Supreme Court of Texas.

July 26, 1978.

As Corrected On Denial of Rehearing Oct. 25, 1978.

McGinnis, Lochridge & Kilgore, Dean M. Kilgore and Robert C. McGinnis, Austin, Seldon B. Graham, Jr., Houston, for appellant.

John L. Hill, Atty. Gen., Ralph T. Aldave, Asst. Atty. Gen., Austin, Graves, Dougherty, Hearon, Moody & Garwood, Dan Moody, Jr. and Robert C. Grable, Austin, J. S. Rowe and Benny J. Lowe, Midland, for appellees.

GREENHILL, Chief Justice.

This is a direct appeal involving a Railroad Commission order which grants appellee BTA Oil Producers a permit to drill at a requested location under the Commission's Statewide Spacing Rule 37. The central issue in the case is whether BTA Oil Producers was entitled to a permit under the Rule 37 waste exception, taking into consideration economic factors arising from the presence of an existing well bore at the

requested location. On appeal of the Commission's order, the district court held that BTA Oil Producers was so entitled, and we agree. The judgment of the district court upholding the Commission's order is affirmed.

BTA Oil Producers [hereinafter BTA] is the owner of a lease on a 673 acre tract in the Beall (Devonian) Field, Ward County, Texas. The Devonian Field has been classified by the Railroad Commission as an oil field with an associated gas cap. The field contains an upper gas producing zone and a lower oil producing zone. Under the Railroad Commission rules which govern the allowables for associated fields, wells in such fields may be allowed to produce both oil and gas; the amount of allowable gas production is controlled in direct relation to the amount of oil production.[1] Whether a well is classified as an oil well or as a gas well depends on the ratio of gas production in cubic feet to oil production in barrels.[2]

Under the applicable field rules, spacing for the Devonian Field is governed by the Railroad Commission's Statewide Spacing Rule 37. That rule provides as follows:

(A) (1) No well for oil or gas shall hereafter be drilled nearer than twelve hundred (1200) feet to any well completed in or drilling to the same horizon on the same tract or farm, and no well shall be drilled nearer than four hundred sixty-seven (467) feet to any property line, lease line, or subdivision line; provided that the Commission, in order to prevent waste or to prevent the confiscation of property, may grant exceptions to permit drilling within shorter distances than above prescribed when the Commission shall determine that such exceptions are necessary either to prevent waste or to prevent the confiscation of property.

The present suit arises from an application filed by BTA to obtain an exception under this rule. Exxon contested the application as an offset operator.

At the time of the proceedings in question, the Devonian Field contained four wells classified as oil wells and two wells classified as gas wells. The gas wells are the Exxon Herd Gas Unit No. 1 and the BTA Wedge Gas Unit No. 1. On the same tract as its Wedge Gas Unit No. 1, BTA has a well known as the Wedge No. 2. This well was originally drilled as a test well to the Ellenberger Formation, which lies considerably deeper than the Devonian Field.[3] Upon discovering the Ellenberger to be non-productive, BTA completed the Wedge No. 2 in the Montoya Reservoir, which is between the Ellenberger and the Devonian. The Wedge No. 2 was a commercial producer of gas in the Montoya Reservoir; but, according to the testimony in the present case, the Montoya reserves are nearing depletion. BTA therefore applied to the Commission for a permit to plug back and recomplete the Wedge No. 2 in the Devonian Field. Such recompletion required a Rule 37 exception because, at Devonian depth, BTA's Wedge No. 2 and BTA's Wedge No. 1 are only 265 feet apart, rather than the 1,200 feet required by the Rule for a "regular" location. There is no dispute that the Wedge No. 2 well is an acceptable distance from Exxon's Herd No. 1 well and from all relevant property lines.[4] There is also no dispute that, because of the size of the tract, BTA is entitled to sixteen wells on its Wedge lease.

BTA sought a Rule 37 exception on both of the grounds described in Rule 37: to prevent waste and to prevent confiscation. BTA's confiscation claim related to confiscation of BTA's share of the gas production from the Devonian Field. The Commission,

1. Railroad Commission Statewide Rule 49–B.

2. Texas Natural Resources Code § 86.002(5)(B) and (6).

3. The Ellenberger Formation lies approximately 15,500 feet below the surface, whereas the Devonian Field begins approximately 12,000 feet from the surface. An intermediate reservoir,

the Montoya, lies approximately 13,000 feet below the surface.

4. Testimony before the Commission indicated that the BTA Wedge No. 2 and Exxon Herd No. 1 wells are separated by about 7,000 feet or more than a mile. The Wedge No. 2 well is 773 feet from the nearest lease line.

however, based its order solely on BTA's waste argument; and that argument was related to waste of oil.

At the hearing before the Railroad Commission, BTA produced evidence designed to show that recompletion of the Wedge No. 2 well in the Devonian Field was necessary to prevent waste of oil from the field. BTA's evidence indicated that, at least in the Wedge No. 2 well bore, the lower oil productive strata (Lower Devonian) was completely separate from the upper gas productive strata. Because BTA's tests showed the Lower Devonian pressure to approximate the original reservoir pressure in the area, BTA concluded that none of the four oil wells presently existing in the Devonian Field were able to recover oil in the vicinity of the Wedge No. 2 well bore; BTA's expert witness testified there was a possibility that BTA's Lower Devonian oil reserves were contained in a reservoir separate from all other wells in the field. BTA has admitted, however, that these reserves could probably be recovered at a regular location on BTA's tract. At this stage, BTA's economic arguments come into play.

The evidence produced at the hearing demonstrated that BTA's only existing Devonian well, the Wedge No. 1, is plugged back with concrete above the oil productive portion of the field and is therefore incapable of producing the Lower Devonian oil. BTA's expert witness testified that, although the oil could be recovered by drilling a completely new well at a regular location, BTA could not economically justify such drilling. Thus, BTA's position was that the Rule 37 exception was economically necessary to prevent waste of the Lower Devonian oil. BTA's witness testified that, because the economics would not justify the drilling of a new well, the oil reserves were only recoverable through use of the existing Wedge No. 2 well bore.

The Railroad Commission, in adopting the Findings of Fact and Conclusion of Law found in the Hearing Examiner's Proposal for Decision, agreed with BTA's position. Among the Commission's relevant findings are the following:

6. There is no effective communication between the Upper Devonian gas cap and the Lower Devonian oil zone in the Wedge No. 2 well.

8. BTA's Wedge No. 1 well did not penetrate the Lower Devonian oil zone and cannot be feasibly completed in such zone.

13. The Wedge No. 2 well will recover reserves in the Lower Devonian oil column which cannot be produced by any existing well.

14. A regular location 1200 feet or more from the BTA Wedge No. 1 well should encounter approximately the same thickness of Devonian reservoir as the Wedge No. 2 well.

15. The Lower Devonian oil reservoir and the gas cap of the Beall Devonian Field [is] recognized as one field by the Railroad Commission.

In Findings of Fact 9 and 10, the Commission also found that BTA was entitled to a second Devonian well on the Wedge lease and that completion of such a well would not increase the lease's allowable.

The significant Conclusions of Law adopted in the Commission's order are as follows:

2. Based on the fact that this well will recover oil otherwise unrecoverable by any existing well, it is concluded that this well is necessary to prevent waste.

3. Based on the fact that the lease is entitled to an additional well in the Beall (Devonian) Field, and the fact that a regular location would encounter approximately the same thickness of Devonian, it is concluded that the location is a reasonable location in the Beall (Devonian) Field.

4. This exception is necessary to afford applicant a reasonable opportunity to recover the Devonian hydrocarbons underlying applicant's lease, and to utilize an existing well bore for this purpose.

Based on these findings and conclusions, the Commission entered its order in Rule 37 Case No. 75,332, granting BTA a permit to

plug back and recomplete the Wedge No. 2 in the Devonian Field. Exxon, alleging interest as an offset operator, brought suit in the District Court of Travis County to set aside the Commission's order and to enjoin BTA from producing from the Devonian Field through its Wedge No. 2 well. The district court upheld the Commission's order and denied Exxon's prayer for injunctive relief. Exxon then perfected this direct appeal to this court, pursuant to Texas Revised Civil Statutes article 1738a and 499a of the Texas Rules of Civil Procedure.

As noted at the outset, the central issue in this case is whether BTA was entitled to a Rule 37 exception on the basis of economic conditions arising from the presence of an existing well bore. Both parties agree that the exception may only be granted where necessary to prevent waste or confiscation. *Railroad Commission v. Williams,* 163 Tex. 370, 356 S.W.2d 131 (1961). Exxon argues that, in addition, a Rule 37 exception may only be granted upon a showing of unusual reservoir conditions. This position is predicated on language in two opinions by this court.

*Railroad Commission v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022 (1942), (commonly known as the "Trem Carr" case), was a Rule 37 case which involved the "more wells, more oil" theory. The Railroad Commission had granted a Rule 37 permit to prevent waste of oil, based upon testimony that the well requested in the permit would add to the total production from the field. This court concluded that the permit was improperly granted, because the testimony offered in support of the special location was equally applicable to any other part of the field. In a holding relied upon by Exxon in the present case, the court stated:

> There must be some factual basis for classifying some applicants as subject to the general spacing provisions of the rule and other applicants within the exception. This reasonable basis can only be a showing of unusual conditions peculiar to the area where the well is sought to be drilled—not testimony that would be equally applicable to any other part of the field.

161 S.W.2d at 1026. Later in the opinion, the court stated:

> Upon a showing that in a particular field, or in a particular section of a field, on account of the peculiar formation of the underground structure *or other unusual circumstances,* a closer spacing of the wells is essential to recover the oil, undoubtedly the Commission would have authority to grant the exception . . . [emphasis added]

161 S.W.2d at 1027.

The second case relied upon by Exxon, *Wrather v. Humble Oil and Refining Co.,* 147 Tex. 144, 214 S.W.2d 112 (1948), also dealt with the "more wells, more oil" theory. In reiterating its rejection of this theory, this court stated:

> The waste exception clause in Rule 37 has no application where ordinary or usual conditions prevail. To justify an exception under that clause it is necessary to show that the conditions affecting the drainage of wells on a particular tract are so peculiar, unusual, and abnormal that it is removed from the same category of the surrounding area to which the general rule applies. When those peculiar and unusual conditions are found to exist in a localized area, exceptions may then be granted for the drilling of additional wells to the extent necessary to offset the abnormality and place it on [a] parity, from the standpoint of efficient drainage, with other areas where the ordinary and usual reservoir conditions prevail.

214 S.W.2d at 117. Based, then, on these two holdings, Exxon argues that it is a longstanding rule of law in Texas that unusual reservoir conditions must be shown before a Rule 37 permit may be granted to prevent waste. Because the Commission expressly found that BTA's Wedge No. 2 well bore would encounter approximately the same thickness of Devonian formation as would a well at a regular location, Exxon urges that BTA has failed to show such unusual conditions as would support the granting of the permit.

The Railroad Commission and BTA contend, on the other hand, that Exxon's reading of the *Trem Carr* and *Wrather* cases is too restrictive. We agree. The quoted portions of the opinions, and a reading of the decisions in their entirety, indicates a primary concern that some showing be made to differentiate the requested drilling location from other locations, so that the Railroad Commission is not given over-broad discretion in granting Rule 37 exceptions. In both cases cited above, the parties seeking the permits produced testimony that, *because of underground conditions,* drilling wells closer together would produce more oil. The permits were sought simply on the basis, true in all fields, that drilling more wells results in more oil being produced. This court's holdings, and language with reference to underground conditions, must be read in this context. The *Trem Carr* case itself, in the emphasized language quoted above, expressly recognized that "other unusual circumstances," i. e., other than underground conditions, could justify the granting of a Rule 37 exception.

■ In the present case, the requirements of the *Trem Carr* and *Wrather* cases for a showing of unusual conditions has been met. The most obvious condition which differentiates the permit location from regular locations on BTA's tract is the presence of an existing well bore. While it is agreed that the Wedge No. 2 well bore will encounter the Devonian Field at approximately the same thickness that a regular location would, there is also evidence that it is not economically feasible to drill at a regular location. In addition, there is a finding, supported by evidence, that the oil that would be produced from the Wedge No. 2 well cannot be produced by any other existing well. There was, therefore, an adequate basis for the Railroad Commission's finding that recompletion of the Wedge No. 2 well in the Devonian Field was necessary to prevent the waste of oil. We have determined that the Commission made findings adequate to support the granting of the permit, and that such findings are supported by substantial evidence.

■ In its briefs to this court, Exxon argues that there is a great potential for abuse in allowing the Railroad Commission to consider the presence of an existing well bore as a relevant factor in granting a Rule 37 exception. Exxon urges that the existence of well bores is entirely within the oil and gas operators' control, and that operators will be encouraged to drill to deeper formations in such a way as to be able to later disregard spacing rules in intervening formations. Because of this threat, Exxon urges that this court must devise a test limiting the circumstances in which an existing well bore is a proper consideration in a Rule 37 case. We conclude that an appropriate test is whether the existing well was drilled and completed in the original formation legitimately and in good faith, and not as a subterfuge to bolster a later Rule 37 exception. In the present case, there is not even a suggestion that BTA did not meet such a test. The Wedge No. 2 was drilled first to the deeper Ellenberger, and was then completed as a producing gas well in the Montoya Reservoir; and, as the Commission expressly found, the Montoya reserves were nearing depletion at the time BTA sought this permit to plug back the well. Should a case arise in which there is a suggestion that a well has been drilled as a subterfuge to bolster a later Rule 37 application, the Commission, upon finding such a subterfuge, may properly refuse to consider the existing well bore as a factor in granting the Rule 37 exception.

■ Consideration of reasonable economic factors upon which operators must act is one of the underlying bases for Rule 37 itself. As noted in 1 Summers, *The Law of Oil and Gas* 360 § 86 (1954), a reasonable basis for the establishment of a spacing rule is the idea that the resulting unit size is "an area from which the oil may be economically and efficiently produced." The adoption of the spacing rule represents an economic decision that the density of development should be regulated and restricted, at least in part to prevent physical or economic waste from the drilling of wells which are not reasonably necessary to drain a reser-

voir adequately. In addition, this court has repeatedly recognized economic realities in deciding Rule 37 cases. In decisions involving the rights of small tract owners, this court has recognized the basic right of every landowner or lessee to a *fair* chance to recover the oil and gas under his property. *Gulf Land Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 S.W.2d 73 (1937); *Railroad Commission v. Williams,* 163 Tex. 370, 356 S.W.2d 131 (1961). A *fair* chance, in this context, necessarily involves economic factors. The reasonable opportunity for small tract owners to drill a *profitable* well has been described as the theory underlying this court's holding in the *Normanna* case, *Atlantic Refining Co. v. Railroad Commission,* 162 Tex. 274, 346 S.W.2d 801 (1961). 1 Summers, *The Law of Oil and Gas* 70 § 386 (Supp.1978). In *Halbouty v. Railroad Commission,* 163 Tex. 417, 357 S.W.2d 364 (1962), this court refused to foreclose the question of the Commission's power, by proper order or exception, to allow the holder of a Rule 37 permit "to recover a sufficient amount of oil or gas to repay drilling and production costs and provide a reasonable profit." And in *Imperial American Resources Fund, Inc. v. Railroad Commission,* 557 S.W.2d 280 (Tex.1977), this court expressly considered testimony of economic necessity in upholding a Rule 37 permit. The inclusion of economic considerations in Rule 37 proceedings is therefore neither unjustified nor unprecedented.

In the present case, common sense dictates that the economic waste that would result from BTA's drilling a completely new well, simply so as not to crowd its existing well, is a most relevant consideration. BTA's economic argument becomes even more cogent in light of the fact that completion of the Wedge No. 2 well in the Devonian Field can do Exxon no greater harm than would the completion of a well at a regular location. Exxon's own position is that geological conditions are the same, and Exxon has not contested the Commission's finding that BTA is entitled to further Devonian wells on its Wedge lease. Thus, the only advantage Exxon would gain in having BTA drill at a regular location instead of at the exception location lies in the delay factor that would be involved in drilling a completely new well. The testimony Exxon produced before the Commission indicates that Exxon's major concern was with the drainage it would suffer from *any* well on BTA's tract. Exxon argues, and BTA concedes, that in addition to the oil that will be produced from the Wedge No. 2 well, BTA will also be able to recover large quantities of natural gas from the Devonian Field, thereby increasing drainage, or the possibility of drainage, of gas from Exxon's Herd No. 2 well located over a mile to the Southeast. The desire for increased *gas* production is urged as being BTA's true purpose in seeking the Rule 37 exception. While there may be merit in this argument, Exxon's complaints go to the allowable fixed by the Commission for BTA's Wedge Lease. This complaint is properly made in a context other than a Rule 37 spacing exception proceeding.

As stated, the Devonian Formation includes both oil and gas. Other wells in the field produce oil and also gas in large quantities. There is evidence that there is little or no communication between the Lower Devonian, where the oil is, and the Upper Devonian, where the gas is. But the Commission has classified the entire Devonian in this area as one field. Under the rules of the Commission, therefore, both oil and gas, or all hydrocarbons, may be produced from BTA's well subject to existing allowables. If Exxon wishes the Commission to have the Upper and Lower Devonian classified as separate fields, its remedy is to request such a classification change from the Commission. Again, this complaint is not an issue in a Rule 37 proceeding.

In the context of the present case, economic factors were relevant to BTA's application and were properly considered by the Commission in determining whether a Rule 37 exception was necessary to prevent the waste of oil.

The judgment of the district court is affirmed.