## GEORGE VAUGHN V. STATE OF NEBRASKA.

FILED FEBRUARY 8, 1907. No. 14,655.

1. **Rape:** EVIDENCE. In a prosecution for rape, resistance by the female is an issue only so far as it is involved in the proof of her want of consent. To show that the assault was against her will, her resistance must be proportionate to the occasion, under the circumstances, and at the time of the act complained of. In ordinary cases there must be resistance to her utmost, or at least to the extent of her ability. In peculiar cases and under peculiar circumstances, a less degree may be sufficient.

2. ———: INSTRUCTIONS. Where the evidence shows that at the time of the commission of the alleged offense the prosecuting witness made no outcry and did not complain of the offense to others, but concealed it for about twenty days, an instruction that the jury should take these circumstances into consideration, with all the other evidence in the case, in determining the question of the guilt or innocence of the accused, is proper, and under the circumstances of this case it was prejudicial error to refuse to give the same when requested by the defendant, no instruction covering the same ground having been given by the court upon its own motion.

3. **Evidence** examined, and *held* insufficient to support the verdict.

ERROR to the district court for Nemaha county: WILLIAM H. KELLIGAR, JUDGE. *Reversed.*

*T. S. Stevens* and *Stull & Hawxby,* for plaintiff in error.

*Norris Brown, Attorney General, W. T. Thompson* and *C. O. French, contra.*

LETTON, J.

George Vaughn, a young man 22 years of age, was tried in the district court for Nemaha county upon an information in two counts, the first count charging him with rape with force and violence, and the second charging him with the crime of rape with consent, upon the person of one Mina C. Holly. From a verdict of guilty upon the first count he prosecutes error.

1. It is urged that the court erred in refusing a con-

tinuance and in refusing a new trial upon the ground of newly discovered evidence material to the defense. These assignments it is unnecessary to consider since, in our view, the judgment of the district court must be reversed upon other grounds. We may say, however, that under the peculiar circumstances of this case, where all the witnesses resided at a distance from the place of trial and where the defendant had so little opportunity to prepare for his defense, a continuance would have been entirely proper.

2. It is next assigned that the verdict is not supported by the evidence. This requires a recital of the main facts as disclosed by the testimony. The offense was alleged to have been committed in Island precinct, in Nemaha county. This precinct was originally a peninsula nearly surrounded by the Missouri river upon the Nebraska side of the stream, but by a sudden avulsion many years ago the river changed its course, and the land lying to the east of the present channel was cut off and thus physically attached to Iowa and Missouri, while legally still a part of Nebraska. Mina Holly, the prosecutrix, lives in Missouri near the boundary line. The defendant, who had lived in the neighborhood several years, at the time of the alleged offense was working for one Cal Taylor, who lived in Island precinct a few miles from the residence of the prosecutrix. Early in January Taylor's wife left home upon a visit, leaving the defendant and Taylor living upon the farm. Taylor's house is distant about four or five miles in a southeasterly direction from the home of the prosecutrix, which is situated about 5 miles southwest of Hamburg, Iowa. On the evening of January 9, 1906, Taylor and Vaughn drove to Hamburg. Vaughn's sister, Rhoda Vaughn, had been visiting the prosecutrix, who had taken her to Hamburg in a buggy. On her way home she met Taylor and Vaughn on the road. Both parties stopped, and Vaughn got out of the buggy, went to the side of the buggy in which Miss Holly was seated, and asked her, as she testifies, to go to a dance that night, which

she consented to do, if his sister Rhoda Vaughn went. The men went on to Hamburg and made arrangements with Jennie Fletcher, a cook in a hotel there, and evidently a woman of easy virtue, to go out with them that night. About 8 o'clock Taylor, Vaughn and Jennie Fletcher went to Holly's in a single seated buggy. Holly's house was situated at some distance from the road, at the end of a lane. The buggy was stopped some distance from the house and at a point where it was not uncommon for vehicles to stop when parties were coming to the house. Vaughn went to the door and got Miss Holly, who accompanied him to the buggy. When she got there she found Taylor sitting on Miss Fletcher's lap. She testifies she thought it was Rhoda Vaughn and one Cheney until she got in the buggy when Taylor spoke to her and she knew who it was; that she got in and sat in the seat, and Vaughn sat on her lap until they drove along the lane to the main road, a distance of about a quarter of a mile, and that when Vaughn got out to open the gate at the main road she started to get out, but could not because Taylor held her, though Taylor was sitting on Miss Fletcher's lap, holding the lines and the whip, and she was sitting on the seat on Taylor's left side; that after they left the gate Taylor let her get up and sit on Vaughn's lap; that they went rapidly two miles east, past Jennings', Lane's and Bush's houses; that when they got to Bush's house she took the lines and got the team almost stopped, when Taylor took the whip and hit the horses and made them go faster and took the lines away from her. Her testimony was, in substance, that she was kept in the buggy against her will and was driven from her father's house at a rapid rate of speed to the house of Cal Taylor; that there she was taken into the house; that Taylor and the Fletcher woman went up stairs, leaving her and Vaughn in the kitchen, and that, after prolonged resistance upon her part, Vaughn threw her upon the floor and violently ravished her against her will; that he then pushed her up stairs into a bedroom and repeated the act; that she then went down

stairs, and Taylor came down, and Vaughn went up stairs; that Taylor then had forcible intercourse with her against her will; that she ran out of the house and ran as far as she could go, when Taylor came after her and took her back to the house; that after this the others had supper, and that she again tried to get out of the house, but was prevented; that, after the team was hitched up to leave, Taylor and the Fletcher woman again went up stairs, and Vaughn again had forcible intercourse with her. She further testifies that when she was trying to get away from Taylor she ran to the window and he shut it down, when she kicked one of the window lights out and kicked the screen off, then ran back to the door and tore part of the latch off the door in trying to get out.

The story told by the prosecutrix upon her direct examination, if true, would sustain a conviction of the defendant upon the charge of which he was convicted; but upon cross-examination the prosecutrix testified to matters in detail which are extraordinary and so inconsistent and contrary to the nature of things and to the story told upon direct examination that we have serious doubts whether her evidence, taken as a whole, sustains the verdict. She testifies that, though the buggy was driven for four or five miles along a road with six or seven houses standing near, neither along the road nor in front of any of these houses did she make any outcry or in any way resist her forcible abduction by all the means within her power. She did not attempt to turn the horses when she was driving them or to drive up to a house, and after they had turned south on the Island road, and she found she was not going to a dance, they passed several houses. One of them was lighted and was not more than fifteen or twenty feet from the highway. She testifies that when they got to Taylor's house she got out of the buggy herself; that she had a long coat on, reaching below her knees, and it was buttoned the whole evening; that she also wore a heavy wool skirt and a wool waist and had a heavy wool shawl over her head, body and shoulders, reaching nearly

to her waist line, and she also wore a fur collarette, and
that she did not take her shawl or coat off at any time that
night.    She had known Taylor all her life, and Vaughn
about a year, and had gone to a neighborhood dance with
Taylor and Vaughn in September.

The details of her first encounter with Vaughn upon the
kitchen floor fall far short of indicating the degree of re-
sistance to a violation of her person which is necessary to
constitute rape.    Neither she nor the defendant seem to
have suffered any bruises, scratches nor evidence of con-
flict of any kind, and her outer clothing and underskirts,
it appears, bore no evidence of disturbance, though she
testifies her drawers were torn; and there was no evidence
of tears or anger on her part at that time, or of such
nervous disturbance as would be expected in an outraged
woman.    Her general health was so little affected that,
in the short time that intervened between the time of the
alleged offense and the trial, her weight apparently in-
creased, since at the trial she weighed 132 pounds, but
says she might not have weighed more than 125 pounds at
the time of the alleged offense.    There was evidence of a
bruised condition of the parts, but the examination was
not made for several weeks after the event.    After the
party left Taylor's house she was taken home to her
father's house.    She made no complaint of any kind how-
ever at that time.    She went riding with other young men
to church and to dances in the neighborhood and the usual
current of her daily life seems to have been undisturbed.
She did not keep silent on account of any fear compelling
threats, for she testifes that no threat was made to compel
her silence, except that Vaughn said that if she told they
would "put the fixings on her," and that Taylor dared her
to tell.    She testifies she made no complaint until January
29, when she told one Cass, a young man with whom she
had at one time kept company more or less.

The story she tells of the transaction up stairs seems
inconsistent with the idea that she resisted in good faith

to the extent of her ability under the circumstances. In fact her testimony as to her resistance to the act of Taylor is much stronger and more definite than anything she discloses in the way of opposition to the acts of Vaughn. She did not tell her mother about the matter until February 4, some days after she had told Cass, and nearly a month after the alleged rape. She is corroborated to some extent by the fact that a window light was missing and a screen was loose on one of the windows of the Taylor house immediately after the occurrence, though Taylor testifies this condition existed before that time.

Taylor and the Fletcher woman testified for the defense. Their story as to the occurrence tends to show that Miss Holly knew at the time she agreed to go with Vaughn that night that they were not going to a dance, but were going out upon a pleasure excursion, and that when she got in the buggy she was not surprised to find Taylor and the Fletcher woman there; that she went with them cheerfully and voluntarily, and at no time protested or objected. They further testified that when they arrived at Taylor's house the couples separated; that Taylor and Miss Fletcher went up stairs and occupied a room together, as Miss Holly relates, but they say that she voluntarily assisted in getting supper and ate it with them, and that together with the Fletcher woman she cleared up and washed the dinner and supper dishes, and that at one stage in the proceedings she danced a jig. It is very evident that Taylor committed perjury as to what took place between himself and the Fletcher woman when they went up stairs, but the testimony of the Fletchor woman in many respects is similar to that of the prosecutrix as to their doings at the house. Her testimony tends to show that after she and Taylor had been up stairs awhile Vaughn came up and made some remarks indicating that he had found resistance in his efforts to have intercourse with the prosecutrix, and to this extent also her evidence corroborates that of Miss Holly. There is testimony in the

record tending to show a lewd disposition upon the part of the prosecutrix.

The conclusion we draw from the evidence is that Miss Holly went voluntarily with Taylor and Vaughn that night; that she objected to and resisted some of the acts of intercourse testified to, and more especially did she resist the act she swears that Taylor accomplished, but that as to her relations with Vaughn her resistance was not such as might be expected from a woman earnestly seeking to protect her virtue against a ravisher. She was a young woman, apparently in good health, weighing from 125 to 132 pounds, yet she testifies that the defendant pushed her up stairs by the shoulders; that she took hold of the door and he struck her elbow and made her let go, and then, without putting his hands upon any part of her person except her shoulders, he pushed her up the stairway to the bedroom above. This is incredible, if she resisted.

The story also as to the forcible violation of her person in the manner she testifies after they reached the bedroom seems difficult to credit. The fact that she made no complaint for over three weeks, and then told a young man associate, is also a circumstance to be considered.

In *State v. Cowing*, 99 Minn. 123, there is a lengthy examination of the decisions with reference to the degree of resistance and lack of consent on the part of the injured female which is necessary to make the forcible and carnal knowledge of her person constitute the crime of rape. In that case the facts recited as to the assault are somewhat similar to those recounted by the prosecutrix in this case with reference to the first assault upon her by the defendant in the kitchen, as to which she goes most into details. The Minnesota court points out the fact that the testimony did not show that the female used her natural means of defense, and it is said in the opinion: "Not only is she not shown to have used or tried to use her hands, but there is no testimony that she used or tried to use her body, legs, or any other ordinary means of reprisal. Neither the victim nor the perpetrator appear to have borne any

bruise or mark resulting from the struggle. There is confused testimony that one of her skirts was slightly torn, but no evidence that her clothing had been touched or torn. Nor does the record show any threats or intimidation on the part of the defendant, or any intent on his part to use any means necessary to accomplish his purpose, nor any reasonable ground for apprehension of bodily harm, nor such a place or position of the prosecutrix as would have rendered resistance useless." This discussion is as relevant to the facts in this case as if it had been written with reference thereto. In that case it is said that "in a prosecution for rape, resistance by the female is of necessity an issue only as it is involved in the proof of her want of consent, which is always required. To show such unwillingness her resistance must be proportionate to the occasion under the circumstances and at the time of the act complained of. In ordinary cases, there must be resistance to her utmost, or at least to the extent of her ability. In peculiar cases, a less degree may be sufficient." And this is in accordance with the former holdings of this court.   *Olsen v. State,* 11 Neb. 276; *Mathews v. State,* 19 Neb. 333.

3. It is urged by the state that further resistance or any outcry made by Miss Holly would have been useless under the circumstances under which the assault was committed upon her, but this is predicated upon the thought that both Taylor and Miss Fletcher would have consented to a forcible outrage of the prosecutrix, at least to such an extent that they would have refused to come to her assistance. We can hardly believe that if the prosecutrix had resisted to the extent of her ability, had called for help in her extremity or tried to raise an alarm, she would not have found assistance at their hands. Viewing the case as a whole, we think there is not sufficient evidence in the record to sustain a conviction.

4. The defendant requested an instruction that, if at the time the offense is alleged to have been committed the prosecuting witness made no outcry and did not imme-

State v. Frost.

diately complain of the offense to others, but concealed it for a considerable length of time, the jury should take these circumstances into consideration, with all the other evidence and circumstances in the case, in determining the question of the guilt or innocence of the accused. This instruction was refused by the court. No instruction covering the same ground was given by the court upon its own motion, and, under the peculiar circumstances of this case, we think the jury should have been instructed as requested. There appears to be no conflict in the testimony that the prosecuting witness was with the defendant at Taylor's house, and the important inquiry under the first count of the information was whether or not the intercourse, if any had, was by force and against the will of the prosecutrix. This being the case, this instruction, which was based upon the testimony, and which called to the attention of the jury facts which were material to be considered as bearing upon the degree of credit to be given the prosecutrix, and which strongly affected the credibility of her story of the occurrence, was proper, and it was prejudicial error for the court to refuse to give it. A cautionary instruction was also requested and refused, and this instruction also, we think, under the peculiar circumstances of this case, should have been given.

The judgment of the district court is reversed and the cause remanded.

REVERSED.