RAILROAD COMMISSION OF TEXAS ET AL V. STERLING OIL AND REFINING COMPANY ET AL.

No. A-1969. Decided February 16, 1949.
Rehearing overruled March 30, 1949.
(218 S. W., 2d Series, 415.)

548

*Prince Daniel,* Attorney General, *Fagan Dickson, Charles D. Mathews* and *Elton M. Hyder, Jr.,* Assistants Attorney General, and *Joe Greenhill,* Executive Assistant Attorney General, for appellant, Railroad Commission of Texas.

There having been substantial evidence introduced to show that the flare-gas order for the Heyser oil filed to be valid as

a matter of law, reasonable and just, and its enforcement feasible and practicable, it was error for the trial court to hold said order invalid, and to grant a permanent injunction restraining its enforcement. Ohio Oil Co. v. Indiana, 177 U. S. 190; Railroad Commission v. Shell Oil Company, 146 Texas 286, 206 S. W. (2d) 235; Travelers Ins. Co. v. Marshall, 124 Texas 45, 76 S. W. (2d) 1007; Henderson Co. v. Thompson, 300 U. S. 258.

*Walace Hawkins, Raymond Myers, J. W. Timmins, Martin A. Row,* all of Dallas, *Paul A. McDermott* and *Eugene T. Adair,* both of Fort Worth, *M. D. Kirk,* of Tulsa, Okla, *Ellis Chaney, Jr.,* of San Antonio, *Ireland Graves, J. A. Hauhut, James H. Rogers, Graves and Dougherty, Powell, Wirtz & Rauhut,* all of Austin, *Archie D. Gray, Joe S. Brown, Elston R. Law, E. E. Townes, W. B. Browder, Jr., Rex. G. Baker, Nelson Jones,* and *Vinson, Elkins, Weeks & Francis,* all of Houston, for appellees.

The Commission cannot lawfully prevent a use which has been sanctioned by the Legislature; nor can it select one of the uses approved by the Legislature and require appellees to devote their gas to such use to the exclusion of all other uses approved by it; and as the Commission has no lawful authority except that conferred upon it by the Legislature and the four uses specified by the Commission being exclusive, the trial court properely granted a permanent injunction to restrain the enforcement of the order in suit because the commission was without lawful authority to enforce said order. Brown v. Humble Oil and Refining Co., 126 Texas 296, 83 S. W. (2d) 935, 87 S. W. (2d) 1069.; Clymore Prod. Co. v. Thompson, 13 Fed. Supl. 469 (Fed. Dist. Ct.-Texas) Tidewater Assn. Oil Co. v. Clements, 123 S. W. (2d) 780; Missouri, K. & T. Ry. Co. v. State, 100 Texas 420, 100 S. W. 766.

MR. JUSTICE SHARP delivered the opinion of the Court.

This is a direct appeal from the judgment entered December 2, 1948, by the 98th District Court of Travis County, declaring invalid an order promulgated by the Railroad Commission on November 22, 1948, and enjoining the Railroad Commission from enforcing the order. The order prohibited the production of either oil or gas form the Heyser Field unless and until all of the gas produced incident to such production is made available for one or more of the lawful uses as set out in Subsection 1 of Section 7, Article 6008, Title 102, of the Civil Stat-

utes of this State, which lawful uses, as therein set out, are as follows:

"(a) Light or fuel.

"(b) Efficient chemical manufacturing, other than the manufacture of carbon black, * * *

"(c) Bona fide introduction of gas into oil, or gas bearing horizon, in order to maintain or increase the rock pressure or otherewise increase the ultimate recovery of oil or gas from such horizon.

"(d) The extraction of natural gasoline therefrom when the residue is returned to the horizon from which it is produced."

The order was to become effective as of 7:00 a. m., December 1, 1948.

Suit was brought by Sterling Oil & Refining Company and a number of other Heyser Field producers, and it was alleged, among other things, that the order was illegal, unjust, unreasonable, arbitrary, and discriminatory, in that the Commission had no statutory authority to promulgate and enforce it; that compliance with the order within the time set by the Commission was a physical impossibility; that irreparable damage would be done to those wells in the field which have a water drive if they were shut in until the order could be complied with; that the order discriminates against this field in favor of other fields which are not shut down; that some of the leases are being kept in force by production only and might be jeopardized by the enforcement of the order; and that, in view of the fact that the residue gas in this field has been flared since 1938, of which fact the Commission is apprised, and the future fact that some of the producers in the field have made efforts to obtain a market for the gas which is now being flared, the order is unjust, unreasonable, and arbitrary. The trial court held that the order was invalid, and permanently enjoined the Railroad Commission from enforcing the order.

The appeal of the Railroad Commission is predicated upon Section 3-b of Article V of the Texas Constitution, Article 1738a of Vernon's Texas Statutes 1948, and Rule 499a of Texas Rules of Civil Procedure. The Railroad Commission contends that the judgment of the trial court was improper and unwarranted, in that the order of the Commission was reasonably supported by substantial evidence, and it is valid as a matter of law.

Appellees filed their motion to dismiss this appeal, and it is urged that this Court is without jurisdiction to decide the cause on direct appeal. The motion is based upon two grounds. (1) That the constitutional provision cited above gives jurisdiction to this Court only in cases involving the "constitutional validity" of certain laws and orders, and in this case the order is challenged on other than constitutional grounds; and (2) that the direct appeal may not be maintaineed under Rule 499a of Texas Rules of Civil Procedure, because it necessitates the bringing to this Court of a statement of facts for purposes other than those provided for in the rule.

Section 3-b of Article V of the Constitution reads as follows:

"The Legislature shall have the power to provide by law, for an appeal direct to the Supreme Court of this State from an order of any trial court granting or denying an interlocutory or permanent injunction on the grounds of the constitutionality or unconstitutionality of any statute of this State, or on the validity or invalidity of any administrative order issued by any state agency under any statute of this State."

Pursuant to the adoption of Section 3-b of Article V of the Constitution and the enactment by the Legislature of Article 1738a of Vernon's Texas Statutes 1948, Rule 499a of the Texas Rules of Civil Procedure was promulgated by this Court. The pertinent parts of Rule 499a read as follows:

"(a) In view of Section 3 of Article 5 of the Constitution which .confines the appellate jurisdiction of the Supreme Court to questions of law only, this court under the present and later amendment, above cited, * * * has and will take appellate jurisdiction over questions of law only, * * *.

"(b) An appeal to the Supreme Court directly from such a trial court may present only the constitutionality or unconstitutionality of a statute of this State, or the validity or invalidity of an administrative order issued by a state board or commission under a statute of this State, when the same shall have arisen by reason of the order of a trial court granting or denying an interelocutory or permanent injunction.

"(c) Such appeal shall be in lieu of an appeal to the Court of Civil Appeals and shall be upon such question or questions of law only, and a statement of facts shall not be brought up except to such extent as may be necessary to show that the appellant has an interest in the subject matter of the appeal and to show the proof concerning the promulgation of any ad-

ministrative order that may be involved in the appeal. If the case involves the determination of any contested issue of fact, even though the contested evidence should be adduced as to constitutionality or unconstitutionality of a statute, or as to the validity or invalidity of an administrative order, neither the statute or statutes, above mentioned, nor these rules, apply, and such an appeal will be dismissed."

■ A similar order of the Railroad Commission was involved in the case of Railroad Commission v. Shell Oil Co., Inc., 146 Texas 286, 206 S. W. (2d) 235 (known as the Seeligson case), and a direct appeal was taken from the judgment of the trial court to the Supreme Court. A motion to dismiss the appeal was based on the ground that this Court did not have jurisdiction of the case. This Court in an exhaustive opinion reviewed the provisions of the Constitution, the Articles of the Statutes, and Rule 499a, and held that this Court did have jurisdiction of the case.

This Court has held that the Legislature has clothed the Railroad Commission with special poweres to perform special functions relating to oil and gas, and in reviewing the evidence forming the basis for the type of order under consideration no question of the preponderance of the evidence is involved. In passing upon an order of this kind by the Railroad Commission, the rule is announced that it is a question of law as to whether or not the order is reasonably supported by substantial evidence, and the Supreme Court has jurisdiction to consider the record involved in the case and pass upon the validity of the order. Thomas v. Stanolind Oil & Gas Co., 145 Texas 270, 198, S. W. 420; Trapp v. Shell Oil Company, Inc., 145 Texas 323, 198 S. W. (2d) 424; Hawkins v. Texas Company, 146 Texas 511, 209 S. W. (2d) 338; Wrather v. Humble Oil & Refining Co., 147 Texas 144, 214 S. W. (2d) 112; Railroad Commission v. Humble Oil & Refining Co., Tex. Civ. App., writ refused, 193 S. W. (2d) 824. In this case the record of the proceedings in the trial court, including the statement of facts, is before us, and in considering the record as to whether there is any substantial evidence reasonably to support the order in the case we are passing upon a question of law, and are not determining a contested issue of fact, and in doing so Rule 499a is not violated. Therefore the motion to dismiss the appeal is overruled.

■ It is further urged by appellees that the information or data printed on the ballot was too indefinite to apprise voters of the

purpose of Section 3-b of Article V. The ballot contained the following statements:

"FOR THE AMENDMENT TO THE CONSTITUTION OF THE STATE OF TEXAS AUTHORIZING THE LEGISLATURE TO PROVIDE FOR APPEALS DIRECT TO THE SUPREME COURT IN INSTANCES INVOLVING THE CONSTITUTIONALITY OF CERTAIN LAWS AND ORDERS."

"AGAINST THE AMENDMENT TO THE CONSTITUTION OF THE STATE OF TEXAS AUTHORIZING THE LEGISLATURE TO PROVIDE FOR APPEALS DIRECT TO THE SUPREME COURT IN INSTANCES INVOLVING THE CONSTITUTIONALITY OF CERTAIN LAWS AND ORDERS."

Article XVII of the Constitution provides the method by which amendments to the Constitution are to be adopted. That article provides that, "The Legislature * * * may propose amendments to the Constitution, to be voted upon by the qualified electors * * * which proposed amendments shall be duly published once a week for four weeks, commencing at least three months before an election, the time of which shall be specified by the Legislature, in one weekly newspaper of each county, in which such a newspaper may be published, * * *." There is no contention made that this provision of the Constitution was not complied with.

The Constitution requires that certain publicity shall be given a proposed amendment prior to an election. This is done to identify the amendment and to show its character and purposes, so that the voters will be famliiar with the amendment and its purposes when they cast their ballos. In many instances it would be impracticable to print an entire amendment on a ballot, and the method adopted in submitting the amendment under consideration was similar to that used in submitting many other amendments in the past. The method used in this instance was sufficient. See Whiteside v. Brown, Tex. Civ. App., 214 S. W. (2d) 844; writ dismissed w. o. j., Fellows v. Eastman, 126 Maine 147, 136 Atl. 810; Cudihee v. Phelps, 76 Wash. 314, 136 Pac. 367; Cooney v. Foote, 142 Ga. 647, 83 S. E. 537, Ann. Cas. 1916B, 1001; State v. Osbourne, 153 Ore. 484, 57 Pac. (2d) 1083; Russell v. Croy, 164 Mo. 69, 63 S. W. 849; Fleming v. Royall, 145 S. C. 438, 143 S. E. 162; City of Jackson v. Mims, 316 Mich. 694, 26 N. W. (2d) 569; Lovett v. Ferguson, 10 S. D. 44, 71 N. W. 765; State ex rel. Harry L. Hussman Refrigerator & Supply Co. v. City of St. Louis, 319 Mo. 497, 5 S. W. (2d) 1080; State ex rel. Thompson v. Winnett, 78 Neb. 319, 110

N. W. 1113, 10 L. R. A. (N. S.) 149, 15 Ann. Cas. 781; 29 C. J. S. 245, Elections, sec. 170, 18 Am. Jur. 298, Elections, sec. 180.

We do not think that it would be sound to permit the ballot form to have the effect of limiting the natural meaning of the language of the amendment itself. The contention that the ballot insufficiently described the amendment is also overruled.

■ The principal question for determination here is whether the flare-gas order of the Railroad Commission was fair and reasonable and reasonably supported by substantial evidence. We must also decide whether the trial court erred in striking down the order for the Heyser Field and in granting a permanent injunction restraining the enforcement of the order.

In 1917 Section 59-a of Article XVI of the Constitution of Texas was adopted. By its provisions it requires the Legislature to "pass all such laws as may be appropriate [to] * * * the conservation and development of all the natural resources of this State." Oil and gas are natural resources of this State.

The basis for the power of the Railroad Commission is found in the Act of the Legislature, Title 102, Article 6004 et seq., Vernon's Texas Statutes, 1948. The Legislature has many times amended the statutes so as to define in plain and specific language the public policy of this State with respect to the conservation of oil and gas and to prevent their waste. The duty to enforce these statutes is placed on the Railroad Commission. The Legislature realized the great value of oil and gas and the importance of the task and duty placed on the Railroad Commission to conserve same for the use of the public, and by many provisions of the statutes full power is given the Railroad Commission to prevent the waste of oil and gas. In addition to the other articles embraced in Title 102 delegating power to the Railroad Commission to prevent waste of oil and gas, Article 6029 also prescribes the purposes for which "the Commission shall make and enforce rules, regulations or orders for the conservation of crude petroleum oil and natural gas and to prevent waste thereof." In addition to the other purposes described in Article 6029, Section 8 thereof further enlarges the power of the Commission, and reads as follows:

"It shall do all things necessary for the conservation of crude petroleum oil and natural gas and to prevent the waste

thereof, and shall make and enforce such rules, regulations or orders as may be necessary to that end."

Many provisions of our oil and gas statutes have been construed by this Court, and it has been held that the Commission has the authority to prescribe fair and reasonable rules to prevent the waste of oil and gas. See Railroad Commission v. Shell Oil Co., Inc., 146 Texas 286, 206 S. W. (2d) 235; Brown v. Humble Oil & Refining Co., 126 Texas 296, 83 S. W. (2d) 935, 87 S. W. (2d) 1069, 99 A. L. R. 1107, 101 A. L. R. 1393; Corzelius v. Harrell, 143 Texas 509, 186 S. W. (2d) 961; Trapp v. Shell Oil Co., Inc., 145 Texas 323, 198 S. W. (2d) 424; Thomas v. Stanolind Oil & Gas Co., 145 Texas 270, 198 S .W. (2d) 420; Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S. W. (2d) 73.

The Heyser Field is located in Calhoun and Victoria counties, and was discovered in 1936. In 1938 a gasoline plant was erected by two of the appellees, producers in this field, and this plant has been operated continuously since that time. The purpose of the plant is to extract from the casinghead gas, used to lift the oil to the surface, the liquid hydrocarbons, and primarily to manufacture natural gasoline therefrom. This process, in addition to the gas used as plant fuel and lease fuel, results in the consumption of about five per cent. of the total chemical contents of the casinghead gas produced at the well head. The residue gas, that which remains after the extraction process is completed, leaves the plant as a tail gate by-product, and is flared. Thus approximately 95 per cent. of the casinghead gas produced along with the production of oil in the Heyser Field is rendered absolutely useless by flaring.

There is no dispute regarding the fact that all the residue gas from the natural gasoline plant in the Heyser Field is flared, and this amounts to approximately twenty-one million cubic feet a day. A gas pipeline belonging to the Tennessee Gas Transmission Company, and extending from Hidalgo County, Texas, to West Virgina, passes within eight miles of the Heyser Field. In September, 1945, the operators in this field began negotiations with the Tennessee Gas Transmission Company with a view of getting it to buy the residue gas from the gasoline plant. A hearing was held in November, 1945, at the request of the Railroad Commission, concerning the gas then being flared in the Heyser Field, and a committee was appointed to study the situation and make recommendations. A second hearing, to determine the extent of progress made in

the elemination of flaring casinghead gas, was held in February, 1946.

On April 3, 1946, the Tennessee Gas Transmission Company agreed to lay a pipeline from its compressor station in Victoria County to the Heyser Field, and to take all the residue gas; provided that the operators would install compressors at the field to raise the pressure of the residue gas to 800 pounds, so that it would enter the pipeline. This agreement was never consummated, as the compressors were not installed, due to differences among the operators in the field.

In March, 1947, another hearing was held by the Railroad Commission concerning the flaring of casinghead gas. At this hearing, as at the other hearings, the Railroad Commission notified the operators that it intended to take action to prevent the flaring of casinghead gas. At each of the hearings the operators represented to the Commission that they would soon be able to reach an agreement.

In April, 1948, the compressors which were necessary to raise the pressure of the residue gas were ordered. During all this time the Tennessee Gas Transmission Company considered itself committed to take the residue gas under the terms of its original offer. The Railroad Commission finally gave notice to the operators to show cause on October 26, 1948, why the casinghead gas which was being flared should not be utilized or diverted to legal use. This led to the promulgation of the order of the Railroad Commission which is the basis of this suit. Now the operators state that the facilities for placing the residue gas in the pipeline of the Tennessee Gas Transmission Company will be ready by April, 1949.

■ The Legislature in definite and specific language has declared that all waste of oil or gas is unlawful and is prohibited. In Article 6014 it has specifically prohibited "surface waste" of oil and gas "without beneficial use." In Article 6008, sec. 6, the power is delegated to the Railroad Commission to make rules, regulations, and orders to prevent such waste, and this necessarily includes the power to define "beneficial use" as used in Section (h) of Article 6014. Article 6014 further provided: "The Commission may consider any or all of the above definitions, whenever the facts, circumstances or conditions make them applicable, in making rules, regulations or orders to prevent waste of oil or gas." Unquestionably the Legislature intended to clothe the Railroad Commission with the power to

determine what constitutes waste under the facts. This authority is broad enough to include "sweet gas," "casinghead gas," and "residue gas." In this instance the Railroad Commission determined that the flaring of the gas in the Heyser Field was waste, and ordered it stopped.

Appellees attack the order on the ground that it prohibits other lawful intermediate and end uses of the gas, and specically mentions uses for gas lift and the manufacture of natural gasoline. Appellants point out that the order does not prohibit any lawful intermediate uses prior to final disposal of the gas, and that it does not limit use for gasoline extraction or manufacture only to instances wherein the residue is returned to the horizon from which produced. The four permissible end uses specifically set out in the order are followed by clear language that any combination of one or more of the uses may be made, and therefore gas may be used for extraction or manufacture of natural gasoline and the residue either returned to the horizon or used for light, fuel, etc. Appellants further contend that this is the construction placed upon similar "end use" statutes and orders of the Railroad Commission for many years. In order to clarify the position of the Railroad Commission on this order, we quote the pertinent portions of an order promulgated by it on January 17, 1949:

"IT IS THEREFORE ORDERED, BY THE RAILROAD COMMISSION OF TEXAS that the following interpretations of flare-gas operating orders be and they are hereby promulgated to clearly state the construction which the Commission has in the past and will in the future place thereon:

"1. The specific uses set out therein have been and are considered as required 'end' uses and are not intended and do not prevent any lawful and beneficial intermediate uses prior to final disposition of the gas. Such permissible intermediate uses include gas lift and processing for manufacture of natural gasoline, as well as utilization of any portion thereof for the manufacture of natural gasoline.

"2. Extraction and manufacture of gasoline is not limited by paragraph (d) of the orders to gas from which the residue is returned to the horizon from which produced, but extraction and manufacture of natural gasoline are permitted when the final disposition of the gas. Such permissible intermediate uses residue is either returned to the horizon or devoted to any of the other end uses; such as light and fuel. This is specifically permitted by that portion of the orders which clearly states that the intent is to require utilization 'for one or more of the purposes above set out.' A combination use for extrac-

tion or manufacture of natural gasoline and light, fuel, or any other of such end uses may be made instead of returning residue gas to the horizon from which produced.

"These interpretations have been generally understood and applied in previous orders and are the same which applied to an identical order in the Seeligson Field which was upheld by the Supreme Court of Texas as being within the power of the Commission. These intermediate and combined uses are not only within the contemplation of such orders but have been and will be encouraged as compliance therewith for the purpose of actually using and conserving gas and preventing unnecessary and excessive waste."

Appellees misconstrue the order of the Railroad Commission relating to the flaring of gas in the Heyser Field. It is quite clear that the Railroad Commission, in the exercise of its duty as prescribed by the statutes, was trying to prevent waste in the flaring of gas. The Railroad Commission is not required to establish a rule that is absolutely perfect. Its members were dealing with a complex problem concerning the Heyser Field, and the Commission's order must be considered from a reasonable and practical standpoint, and it is sufficient if it treats all interested parties justly and impartially. The actions and rulings of the Railroad Commission in attempting to accomplish such results "will not be disturbed by the courts unless such rules or orders are clearly illegal, unreasonable or arbitrary." Corzelius v. Harrell, 143 Texas 509, 186 S. W. (2d) 961, and cases cited; Railroad Commission v. Shell Oil Co., Inc., 146 Texas 286, 206 S. W. (2d) 235.

Appellees also contend that the order is unreasonable, arbitrary, and discrimnatory, and that it is impossible to comply with the order within the time fixed therein. They state that the order can be complied with by April 1, 1949, but to enforce it before that time would cause irreparable damage and loss to some operators in the Heyser Field. It is undisputed that a great volume of this gas is destroyed daily. The testimony set out above shows that through the years past the efforts of the Railroad Commission have been to prevent further unnecessary waste of this valuable natural resource. Furthermore, the Commission has indicated its willingness to hear the plea of any operator whose property would be damaged by the enforcement of such an order. To prove that appellees' apprehensions are not justified, when considered in the light of the testimony introduced, we quote from the testimony of members of the Railroad Commission the following:

Commissioner Murray testified as follows:

"Q. Now Commissioner, as a petroleum engineer, I want to ask you about whether there would be any waste occasioned by ceasing to produce this field for a limited time, until the operators could comply with this flare gas order, and if so, how much waste and how and why would it occur?

"A. There possibly would be some wells which because of mechanical conditions would have things happen to them as a result of being shut down and which could cause an expenditure of money to bring them back on production. Wells that are producing a large quantity of water and making a good deal of sand would what is called sand-up. Now it is my opinion that had compliance with this order been adhered to, and the operators of such wells that were in such mechanical condition as would be damaged by shutting them in, could have come to the Commission and shown these factors and those wells would have been excused from compliance with the shut-down provisions."

Commissioner Thompson testified as follows:

"Q. Colonel, there has been some testimony here about edge wells and the probability that some of them would be affected by closing in of a field. I will ask you whether or not the Commission is open to receive applications for special treatment in any particular wells?

"A. That is standard operating procedure with us. We leave each order open at the bottom, 'this docket is kept open for further and additional orders in this cause' and upon application by any party showing his well would be irreparably injured, the Commission has always granted relief and has exempted such well from the shut-down, perhaps erring on the side of being too liberal. I cannot recall of any instance where we have failed to give relief where the showing was made that closing the well in, would permanently injure the well or the property.

"Q. And in such an event, you would entertain such an application, would you not?

"A. Not only entertain it, but grant it and be on the side of caution, rather than too tight. Our whole fault all along is being too liberal in our administration."

It clearly appears from this record that the Commission is trying to carry out the mandate of the Legislature and pre-

vent the waste of a very valuable and important natural resource, and in doing so that it will not willfully act in a tyrannical or arbitrary manner. Its members show an inclination to co-operate with the operators in preventing waste, and if a bona fide effort is made to comply with an order of the Commission, the Commission will not be unreasonable, and will make exceptions to prevent unnecessary damage or loss to the operators. If this gas, which is an important natural resource, is to be conserved, some action is necessary to prevent its further unnecessary waste. It will be too late to speculate on what to do when the gas is exhausted through waste.

This Court has held that each oil field presents a separate problem. This Court is here passing only on the order relating to the Heyser Field, and the decision in this case does not prejudge the issues that may be involved in other fields.

We hold that the order of the Railroad Commission in this case is reasonably supported by substantial evidence, and that it is valid. We further hold that the order is not discriminatory, unreasonable, or arbitrary, and it is affirmed. The judgment of the trial court is reversed, and the injunction restraining the enforcement of the order under consideration is dissolved.

Opinion delivered February 16, 1949.

MR. JUSTICE SMEDLEY, dissenting.

I cannot agree to the decision of the majority that the Court has jurisdiction of this case on direct appeal. Appellees correctly, in my opinion, challenge the jurisdiction on two grounds. The first of these is that Section 3-b of Article V of the Constitution (adopted as an amendment by election held November 5, 1940) confers jurisdiction by direct appeal only in certain cases involving *Constitutional validity* of statutes or of administrative orders issued by state agencies; and that this case as attempted to be brought to this Court by direct appeal, presents only a question as to the factual basis of an order of the Railroad Commission, that is, whether the order is reasonably supported by substantial evidence introduced in District Court.

The wording of the amendment, which is copied in the opinion of the majority, is that the Legislature shall have the power to provide by law for an appeal direct to the Supreme Court from an order of any trial court granting or denying

an injunction "on the grounds of the constitutionality or unconstitutionality of any statute of this State, or on the validity or invalidity of any administrative order issued by any state agency under any statute of this State." The majority opinion takes jurisdiction of the case, considers the statement of facts, and passes upon the factual basis of the order under attack, thus assuming that the words "validity or invalidity of any administrative order" include the correctness of the order as supported by the facts. The word "valid" in its broadest sense, applied to an order of the Railroad Commission or other administrative agency, may be used as having reference to the correctness of the order in its factual support, but on the other hand the word may be used in a narrower sense and with more exactness as meaning validity of a fundamental nature, that is, constitutional validity. The more reasonable conclusion, in my opinion, is that the word was used and intended to be used in this amendment in the narrow or more exact sense.

That this is true follows from a consideration of the purpose of the amendment and of the radical and perhaps disastrous change that it would authorize to be made in the Court's jurisdiction were it construed in its broadest sense so as to authorize the conferring of jurisdiction by direct appeal in all cases, where injunction has been issued or denied, involving the correctness in factual support of any and all orders of any and all administrative agencies of the State.

Obviously the purpose of the amendment was to obtain prompt and final decision of questions of vital importance arising in certain cases, by skipping over the Courts of Civil Appeals and taking cases by direct appeal to the Supreme Court. Questions of constitutionality are usually regarded as of greatest importance. Consequently the amendment authorized the Legislature to provide by law for direct appeals in certain cases involving *the constitutionality of statutes*. It is significant that the language of the amendment refers only to constitutionality of statutes and not to construction of them. Questions as to construction of statutes may often be of very great importance, but the amendment does not extend the authority to those questions. In its inclusion of orders of administrative agencies the amendment uses the words "validity or invalidity" rather than the words "constitutionality or unconstitutionality". But if the words used are taken in their narrow or more exact sense of fundamental validity or invalidity, that is, constitutionality or unconstitutionality, there is consistency in the amendment; it limits the authority to provide for direct appeal to cases and

questions of constitutionality, cases and questions of vital importance, whether a statute or an order of an administrative agency is involved; and it does not authorize the imposition upon the Court of the burdensome duty of reviewing statements of facts, in appeals taken as a matter of right, for the purpose of ascertaining what is the basis in the facts, and whether that basis is reasonable, for various and sundry orders of various and sundry administrative agencies. Whether this order or that order of an administrative agency is valid, in the sense that it is reasonably supported by substantial evidence, is rarely of such vital importance as to justify a by-passing of the Courts of Civil Appeals in order to obtain from the Supreme Court a quick decision by direct appeal, and unless the language used absolutely demands it, the amendment should not be construed as authorizing legislation for direct appeals in cases of that kind.

The amendment by reason of the use of the words "validity or invalidity", when speaking of an administrative order, in close connection with the words "constitutionality or unconstitutionality" when speaking of a statute, is certainly open to construction. That constitutional validity or invalidity is intended is evidenced by contemporary construction of the amendment in its adoption and submission to the voters by the Legislature, in its official publication, and in this Court's action in promulgating in Rule 499a the procedeure for direct appeals.

The Resolution proposing the amendment as published in the Session Laws of the 46th Legislature is entitled: "A Resolution Proposing a Constitutional Amendment to Authorize the Legislature to Provide for Appeals Direct to Supreme Court in Instances *Involving Constitutionality of Certain Laws and Orders."* (Emphasis added.) Section 1 of the Resolution is the proposed amendment in the language as set out in the majority opinion and above stated. Section 2 of the Resolution provides for the submission of the amendment to the qualified voters and that at the election the voters favoring the proposed amendment shall write or have printed on their ballots the words: "For the amendment to the Constitution of the State of Texas authorizing the Legislature to provide for appeals direct to the Supreme Court *in instances involving the constitutionality of certain laws and orders".* (Emphasis added.) Section 2 directs what shall be written or printed on the ballots of the voters opposed to the amendment. It is the same as that above quoted

except that the word "against" is used instead of the word "for". (Acts Regular Session, 46th Legislature, pp. 714-715.)

It is granted that the amendment as set out in Section 1 of the Resolution has become a part of the Constitution through its adoption by the electors, but the whole of the Resolution may be looked to in determining the meaning of Section 1. It is not lightly to be assumed that the Legislature meant by one section of the Resolution that direct appeals might be authorized in cases involving validity of administrative orders in the broadest sense and meant by another section of the same Resolution that direct appeals might be authorized only in cases involving constitutionality of such orders. It is not to be assumed that the Legislature intended to mislead the electors by requiring them to vote on the question whether direct appeals might be allowed only when constitutionality of administrative orders is raised. Yet that is what was done, that is, the voters were misled, if Section 1 is construed to include cases in which any sort of question as to validity of orders, including factual support, is presented. The safer course, with due regard to the rights of the electors, is to construe the amendment as meaning what they voted upon, and it can be given that construction without doing violence to its language. It is also granted that the title of the Resolution above quoted is not a part of the amendment, but it does represent the construction placed upon the amendment by the officials who were charged with the publication of the Acts of the Legislature, including the Resolutions.

Rule 499a promulgated to regulate appeals pursuant to the amendment represents this Court's construction of the amendment as intending not to include direct appeals in cases where the question is as to the reasonable sufficiency of the factual support for the administrative order. This, because of the express provision of Rule 499a which prohibits the use of a statement of facts. The question whether an order is reasonably supported by substantial evidence cannot be determined without examination of all of the evidence introduced on the trial in court.

The Attorney General contends that this Court in two cases directly appealed has in effect construed the amendment as authorizing direct appeals in cases where statutory validity of administrative orders rather than constitutional validity was presented. The cases are Board of Insurance Commissioners v. Guardian Life Insurance Co., 142 Texas 630, 180 S. W. (2d) 906 and Railroad Commission of Texas v. Shell Oil Co., 146 Texas 286, 206 S. W. (2d) 235 (the Seeligson casee). Examina-

tion, however, of the opinions and of the records in those two cases shows that in neither of them was the question whether the amendment authorized direct appeals only in cases involving constitutional validity of administrative orders either discussed or decided by the Court, or presented by motion or by brief. In each of those cases the appeals were from orders granting temporary injunction, and in each of them the order of the trial court was affirmed. In the Guardian Life case the Court held that the order of the Board was invalid because in entering it the Board went beyond the authority given by the statute. In the Seeligson case the Court, in affirming the order granting a temporary injunction on the ground that the trial court did not as a matter of law abuse its discretion, expressed the opinion that the order of the Commission was "well within the perimeter of its delegated powers".

If these two cases are to be considered decisions by the Court that it has jurisdiction in direct appeals of cases presenting the question whether the administrative order is authorized by statute, the implied decision as to jurisdiction goes no further than that. A decision that an administrative order is or is not within statutory authority is one of fundamental validity, the same in principle as a decision that a statute is or is not contrary to the Constitution. The implication as to jurisdiction in those two cases does not amount to a holding that there may be a direct appeal in cases where the question is whether the order is reasonably supported by substantial evidence and where examination of all of the evidence introduced in district court, both in favor of and against the order, is required.

The second ground on which jurisdiction is challenged is by reason of Rule 499a, both as a construction of the amendment by the Court and in its express prohibition of a statement of facts. The effect of the rule as a construction of the amendment has been discussed above. The one question raised by appellants' one assignment or point cannot be decided without an examination by the Court of all of the evidence admitted on the trial in the district court. Hawkins v. Texas Company, 146 Texas 511, 209 S. W. (2d) 338; Wrather v. Humble Oil & Refining Co., 147 Texas ____, 214 S. W. (2d) 112. The opinion of the majority quotes most of Rule 499a, including the part which provides that "a statement of facts shall not be brought up except to such an extent as may be necessary to show that the appellant has an interest in the subject matter of the appeal and to show the proof concerning the promulgation of any

administrative order that may be involved in the appeal." But the opinion of the majority then proceeds to disregard the Court's rule by reviewing and considering the evidence in the statement of facts for the purpose of determining whether the order of the Commission is reasonably supported by substantial evidence.

In his first brief the Attorney General expresses the belief that Rule 499a in "limiting appeals to questions of law in these specific types of cases is not in harmony with the specific constitutional provision", meaning the amendment. This contention is directly refuted by the Court's opinion expressed in the Seeligson case that the amendment means that the appellate jurisdiction of the Court shall continue to be limited to questions of law and that to that end Rule 499a was framed to exclude from consideration controverted issues of fact. 146 Texas 286, 291, 206 S. W. (2d) 235.

The Attorney General's second brief, that directed particularly to the question of jurisdiction, omits the attack on the rule made in the first brief and makes no attack either upon the part of the rule which excludes issues of fact or upon the part which prohibits a statement of facts. The brief argues that the statement of facts may be considered under the provision that a statement of facts may be brought up to such extent as may be necessary to show "the proof concerning the promulgation of any administrative order that may be involved in the appeal", and that accordingly in this case all of the evidence may be brought up and considered to show whether the order is reasonably supported by substantial evidence. The argument is unsound. In the cases last cited and in others the Court has held that in a suit questioning the factual basis of an order of the Commission, the trial court and the appellate courts must determine from all the evidence introduced on the trial whether the Commission's order is reasonably supported by substantial evidence. This has reference to the evidence admitted and heard in district court where the factual reasonableness of the order promulgated by the Commission is tested by suit, and this is the evidence which the majority has considered in making its decision herein. This is not "proof concerning the promulgation of" the administrative order. Proof concerning the promulgation of the order would relate to what was done by and before the Commission in the promulgation of the order. For example, such proof would be that the order was made, what the order was, and whether it was made after notice and hearing, and whether the Commission permitted the introduction of

evidence. The exception permitting the bringing of a record to show the facts as to such matters was doubtless intended to afford the opportunity to prove constitutional validity or invalidity of the administrative order, having in mind due process.

The meaning of the Court's rule is plain. The Court should observe it or should hold it unconstitutional. It is not unconstitutional. First, it should be observed that the rule was deliberately promulgated by the Court after due consideration. The promulgation of the rule, while not a decision of a cause, is the expression of the Court's opinion that the rule is valid and not unconstitutional. Words used by Chief Justice Phillips in San Antonio & Aransas Pass Ry. Co. v. Blair, 108 Texas 434, 436, 196 S. W. 502, are appropriate here, although they were not used in reference to a rule but in reference to the Court's action in proceeding under a statute attacked as unconstitutional. He said: "Had we not determined it to be a valid Act, we would not have proceeded under it. It was intended, therefore, that our action in inagurating it should serve as in effect a judgment in respect to its validity, and should be so understood".

The amendment is not self-executing. It is not even mandatory in its terms. It provides merely that the Legislature shall have the power to provide by law for direct appeals to the Supreme Court in certain cases described in general terms. The Act of the Legislature, in substantially the language of the amenedment, is merely that appeals may be taken direct to the Supreme Court in the cases described in the amendment. The Act makes it the duty of the Supreme Court "to prescribe the necessary rules of procedure to be followed in perfecting such an appeal." Acts Regular Session, 48th Legislature, Chapter 14 (Vernon's Annotated Civil Statutes, Article 1738a). Thus there is no legislation regulating appeals except Rule 499a of the Supreme Court promulgated pursuant to the authority given by the act of the Legislature and under the Court's rule-making power.

The amendment and the Act of the Legislature contain no regulations, restrictions or limitations of the method of appeal or of the means by which jurisdiction to hear the appeal may be acquired. Neither the amendment nor the Act provides that there shall be an appeal as a matter of right. Neither of them undertakes to regulate the procedure for appeal, when or how it may be taken, or what shall be contained or not contained in the record. These are left to rules to be prescribed by the Court.

The Court in its Rule 499a, after the paragraph excluding from consideration contested issues of fact and forbidding the bringing up of a statement of facts, provided that the rules prescribed for appeal to the Court of Civil Appeals, except where inconsistent with Rule 499a, should apply to direct appeals to the Court. No doubt the Court could have restricted the direct appeals by adopting the writ of error practice, since neither the amendment nor the statute grants direct appeal as a matter of right, and fixing a mode of appeal is only a regulation of the manner in which the appeal is to be taken. San Antonio & Aransas Pass Ry. Co. v. Blair, 108 Texas 434, 439 S. W. 502.

The language used in the amendment and in the statute, taken literally, would include jurisdiction over questions of fact as well as over questions of law in the direct appeals, but the Court by Rule 499a has limited or restricted the jurisdiction to questions of law. That part of the rule, as above shown, has been held valid and effective in the Seeligson case, 146 Texas 286, 291, 206 S. W. (2d) 235. If that part of the rule is valid, then the provision of the rule that statements of fact, with certain exceptions, shall not be brought up is valid, and should be given effect, although it may operate to exclude from the Court's jurisdiction certain questions, such as the one question raised by the appeal in this case. A rule defining what shall or shall not be contained in the record on appeal is a "rule of procedure to be followed in perfecting" the appeal, and the promulgation of such a rule is within the authority of the Court. The opinion in San Antonio & Aransas Pass Ry. Co. v. Blair, 108 Texas 434, 196 S. W. 502, supports these conclusions.

The opinion of the majority is erroneous in its statement that substantially the same questions as to jurisdiction presented in this case and discussed above were decided in the Seeligson case. The questions as to jurisdiction presented in this case, as the record, the motion and the briefs in that case show, were not raised in the Seeligson case, and consequently, and as the opinion shows, they were not decided in that case. Motion to dismiss the appeal in that case was made on two grounds, first that the notice of appeal to the Supreme Court was ineffective because jurisdiction of the Court of Civil Appeals theretofore given. That question is not in this case. The second ground of the motion to dismiss in the Seeligson case was that there were contested issues of fact in the case. That contention is not made in this case. The Court in overruling the motion to dismiss in that case held that "a decision of this cause must turn * * * not upon the issues of fact, but of law",

and on that conclusion overruled the motion to dismiss. 146 Texas 286, 291, 206 S. W. (2d) 235. In deciding the Seeligson case the Court did not determine the factual validity of the order of the Commission, saying that its validity must be determined on a full development of the fact upon the final trial. The Court did not look to the statement of facts at all, but after observing that findings of fact of the trial court, not challenged, indicated that evidence had been introduced which at lease tended to sustain the cause of action pleaded by the operators, affirmed the trial court's order, on the conclusion that the trial court did not as a matter of law abuse its discretion in granting the temporary injunction.

This Court is without jurisdiction and the appeal should be dismissed. I express no opinion as to the merits of the question sought to be appealed, not having read the statement of facts, which should not have been filed.

Opinion delivered February 16, 1949.

MR. JUSTICE GARWOOD, also dissenting.

I agree with Justice Smedley's able dissent on the matter of jurisdiction, but even assuming jurisdiction, believe that under the peculiar circumstances of this case the order of the Railroad Commission is unreasonable. No doubt the conservation statutes do empower the Commission to prevent the waste of residue gas which remains after processing casinghead gas for production of natural gasoline and the so-called liquified petroleum gases. But waste is, of course, a relative term, as emphasized in the opinion in the Seeligson case (referred to in the majority opinion), in which this court upheld a temporary injunction against a shut-down order designed to prevent the flaring of raw casinghead gas, while conceding in general the Commission's jurisdiction to control such a practice. Until the date of the Commission's order there evidently never has been anything like a clear policy on the part of the state to treat the flaring of casinghead residue alone as waste under any circumstances. Indeed only a few years ago few would have thought of legal waste in connection with flaring raw casinghead gas, and today no doubt the amount of the latter which is flared throughout the state is much greater than the residue flared in the Heyser field. It clearly appears from the conservation statutes that for many years the legislature has been well aware of the difference between casinghead gas and natural gas from gas wells and between the respective residues of each. It has made express provisions against the flaring of raw or residue gas

originating from gas wells while significantly omitting any such provision with respect to casinghead gas residue or even raw casinghead gas. See Vernon's Annotated Civil Statutes, Art. 6008, Section 2, 3(g), 3(k), 7(l) (d), 7(3); Art. 6008a, Sec. 3; Art. 6014, Sec. (a). Article 6008a, Sec. 3, prohibits the flaring of residue gas from commingled casinghead gas and gas well gas. It was first enacted in 1937 following the enactment of Article 6008, Sec. 3, (k), which already prohibited the flaring of residue gas well gas, and by inference therefore recognized that, at least in the absence of an order of the Commission to the contrary, the flaring of residue from casinghead gas was permissible. It is common knowledge that large scale manufacture of natural gasoline and liquefied petroleum gases from cashinghead gas is a relatively recent development, and it is also common knowledge that the general availability of beneficial usage for such residue gas is a World War II development still in its infancy and still greatly impeded by the notorious war and postwar shortage of equipment and machinery related to the gas transmission business and other enterprises making large use of petroleum gas. In the Heyser field almost since its discovery some twelve years ago there has been in operation a plant manufacturing natural gasoline and liquefied petroleum gases from the raw casinghead gas,—a highly valuable and beneficial operation, which is, of course, specifically approved by the conservation statutes. At the time the plant was erected such operations were generally regarded as rather forward-looking measures for the conservation of the state's resources. Until only three or four years ago there was no available use for most of the residue from that plant and the state evidently thought its flaring—even in the substantial volume of which the Commission now complains—to be a proper incident to the production of oil form the field. When a large potential gas purchaser moved into the area, efforts were evidently made in good faith by some of the leading producers of the field to bring about a sale of the residue, but the problem was such as naturally to require considerable negotiation and delay—particularly since the field was divided into a substantial number of different ownerships all or many of whom had to agree on a program, including the investment of very large sums of money in equipment, before the terms offered by the potential buyer could be met. The evidence shows that from the standpoint of the producers the sale of the residue gas on the terms finally agreed upon is of doubtful economic benefit, while the evident independence of the buyer about seeking the produce suggests that the arrangement is at least not a highly desirable one from its standpoint. In the

face of all this, however, and after the arrangement has been concluded, the equipment ordered, work started for its installation, and an evidently reliable estimate made that deliveries of the residue to the buyer would begin within the most reasonable time of five months, the field is in effect ordered shut down until deliveries of the gas can actually begin. While theoretically the situtaion differs from that involved in Missouri K. & T. Ry. Co. of Texas v. State, 100 Texas 420, 100 S. W. 766, in that no fine or penalty as such is here imposed, the effect is substantially the same under existing conditions, because there appears to be no doubt that deliveries of the gas will begin within the time stated, and the shut down is therefore in substance a penalty on the operators for not having acted sooner. The case also disposes of the contention that the operators were duly "warned" by the Commission long before the shut-down order was issued. The Commission has no more jurisdiction to "warn" than had the legislature in the case cited. Even giving absolute verity to the professional opinions that no substantial ultimate loss of oil will occur by reason of the shut down, the fact of substantial monetary loss to the operators cannot be denied. The shut down of any going business entails a loss, and this is certainly no less true of an oil field. It is true that in the short period in question a substantial amount of residue gas will be saved in the sense that the raw casinghead gas thus shut in will later be produced and the residue from its processing burned for heat and light or otherwise consumed somewhere in the nation instead of being burned at the field. This no doubt represents a theoretical benefit to the heat and light consumers, and it may also operate to extend for some small theorectical period the life of the oil and gas resources of the state. But while this latter object is, in a general sense, within the scope of the state's conservation policy, I cannot see how in the light of the history of that policy as regards casinghead gas and particularly its residue; in the light of what has been done and within only a few weeks will be done by the operators in the Heyser field; of the fact that under these circumstances the shut down is in effect but temporary; and of the plainly remote or theoretical character of the conservation benefits to be derived from the temporary shut down as against its economic hardship on the operators, the order can be regarded otherwise than as an unjustifiable penalty. This is probably but another way of saying that under the circumstances the order plainly does not have any reasonable relation to the prevention of waste. This may have been what was in Commissioner Murray's mind when he said that he individually favored giving the operators

more time. In determining the relationship between the order and the prevention of waste we cannot consider merely the volume of residue gas being flared in the field on the date of the order. Such a view would probably justify shutting down a great number of the oil fields of the state. Many other things must be considered, not least of which are the facts that in the case of oil fields the marketing of such residue for light and heat is a relatively new thing, that on the date of the order no such disposition of the gas was possible despite good faith efforts for many months by at least a substantial part of the operators to bring it about, that definite arrangements have been made to accomplish it by a certain time in the quite reasonably near future and that the shut down will obviously entail economic loss to the operators. Certainly the conduct of the operators in this case does not remotely approach the "indifference" or "perversity" mentioned in the hypothetical example in the Seeligson case, and indeed it is hard to imagine how any operator in his right mind would choose to burn a valuable product if in truth it is valuable rather than merely potentially valuable as of some future date. If the order had for example given the operators until May 1, 1949, before the shut down should become effective, the situation might well be fundamentally different, but, under the facts, I think the trial court's injunction should be sustained.

Opinion delivered February 16, 1949.

Rehearing overruled March 30, 1949.