*Au WW- 2*



# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

March 29, 1957

Senator George Parkhouse                          Opinion No. WW-84
The Senate of The State of Texas
Austin, Texas                                     Re: Constitutionality of Committee
                                                  Substitute for Senate Bill 101.

Dear Senator Parkhouse:

This is in reply to your letter of March 13, 1957, in which you request our opinion as to the constitutionality of Committee Substitute for Senate Bill 101.

This Opinion supplements Opinion No. WW-29. The proposed legislation reviewed in Opinion No. WW-29 was entitled "Committee Substitute for S. B. No. 101". It was concluded in that opinion that the proposed act was unconstitutional. Amendments to cure the constitutional objections were then made to the bill. This bill, with the amendments, and which is the subject matter of this Opinion No. WW-84 is also entitled "New Committee Substitute for S. B. No. 101". This explanation is made to avoid possible confusion between the two bills, both of which have the same S. B. number.

### SUMMARY OF COMMITTEE SUBSTITUTE FOR S.B. 101

Section 1 is the name of the Act, "Texas Gas for Irrigation Act."

Section 2 declares the policy, intention and purposes of the Legislature. In substance these are declared to be to save the soil for the basic industry of agriculture by eliminating erosion and deleterious effects of wind, drought and excessive rainfall through using a portion of available natural gas to pump water from underground reservoirs for irrigation.

Section 3 contains a definition of terms.

Section 4 provides that in order to accomplish the purposes that every mineral operator shall make available upon request of the surface operator an amount of gas produced from the land not to exceed one-eighth of the total gas production.

Section 5 provides that the Railroad Commission shall determine, in event of dispute between mineral operator and surface operator, as to the necessity of whether gas should be made available, and if so, the price and terms.

Section 6 provides that all required pipes, connections and equipment shall be at the sole expense and risk of surface operator. Mineral operator shall not be liable for damage to property.

Section 7 provides for appeals from rulings of the order of the Railroad Commission.

Section 8 provides for commencement of proceedings before the Railroad Commission.

Section 9 provides that mineral operators shall not be required to furnish gas for use off the premises from which it is produced; that actions of the mineral operator in complying with the provisions hereof shall not, of itself, make the mineral operator a public utility.

Section 10 provides that pending determination of a cause before the Railroad Commission, the mineral operator shall furnish gas to surface operator upon request on temporary terms as may be prescribed by the Railroad Commission.

Section 11 provides for the placing of liability upon the mineral operator for failing to furnish gas at the request of the surface operator.

Section 12 repeals all laws or parts of laws in conflict herewith.

Section 13 is a savings or severability clause.

Section 14 declares an emergency and suspends the constitutional reading rule and provides that the Act shall take effect from the date of its passage.

The main questions for our determination are (1) whether the Bill is violative of Article 1, Section 17, of the Texas Constitution, relating to the taking of property for public use; (2) whether the Bill violates Article 1, Section 16, of the Texas Constitution, relating to the impairment of obligations of contract; (3) whether the Bill violates the due process clause of

the 14th Amendment of the U. S. Constitution and Article 1, Section 19, of the Texas Constitution, which is the due process clause.

Also involved is whether the Act is within the provisions of Article 16, Section 59(a) of the Texas Constitution, relating to the conservation and the development of the natural resources of this State. (See footnote.)

The most difficult constitutional question involved in the proposed Act is believed to be that relating to the taking of property.

Although the power of eminent domain is perhaps most frequently exercised by a governmental unit, it may also be given to corporate bodies or individuals. 16a C.J.S., Constitutional Law, Section 646, page 921. The power of eminent domain extends to real property, all kinds of personal property, and intangible or incorporeal rights. 29 C.J.S., Eminent Domain, Section 65, page 853.

Defining a "public use" is one that has given the courts much trouble, and upon which there is a great amount of conflict. As a general statement, some courts have treated the term "public use" as synonymous with "public benefit", "public convenience" or "public advantage", whereas other courts have a more restricted meaning of "public use", defining it to mean use by the public, and not that the use may incidentally have a public benefit. 29 C.J.S., Eminent Domain, Section 31, page 823, Ann. 54 A.L.R. 7.

Since it is the Constitution that prohibits the taking of private property for other than public use, it is for the courts to determine whether the particular use to which the condemned property is to be put is or is not an authorized taking. Dallas Cotton Mills v. Industrial Company, 296 S.W. 503 (Tex.Comm.App. 1927). Therefore, in order to determine what is an

---

Article 16, Section 59(a): The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, . . . the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, . . . and the preservation and conservation of all such natural resources of the land are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

authorized taking, resort must be had to the cases rather than to definitions. A review of the Texas decision shows that the Texas rule has been that called the "narrow" or "restricted" definition as to what is a public use, although there has been a tendency in recent cases to expand such definition.

In Borden v. Trespalacios Rice & Irrigation Company, 98 Tex. 494, 86 S.W. 11 (1905), affirmed 204 U.S. 667, 27 S.Ct. 785, 51 L.Ed. 671, the issue was the validity of a statute permitting the condemnation of private land by a private corporation for an irrigation canal. The Court sustained the condemnation proceeding on the ground that those along the canal would have the right to take water therefrom, which made the taking for a public use. In this connection the Court stated:

> "The contention is that the laws in question do not secure any such use to the public, or to any part of it, but that they authorize the creation of purely private corporations . . . for carrying on a business wholly private, and attempt to empower them to take private property for use in such businesses wholly private, without being required to assume any duty to, or to respect any right in, the public. If this were true, we should feel constrained to sustain the attack upon those provisions granting the right of condemnation, for we are not inclined to accept that liberal definition of the phrase 'public use' adopted by some authorities, which make it mean no more than the public welfare or good, and under which almost any kind of extensive business which promotes the prosperity and comfort of the country might be aided by the power of eminent domain."

This case was relied upon in subsequent Texas decisions in determining whether the proposed use was "public" or "private". In Leathers v. Craig, 228 S.W. 995 (Tex.Civ.App. 1921) (involving a condemnation for a road for use by seven citizens), the Court stated:

> "There is no law in this State which would authorize the taking of private property of one individual for private use or convenience of another individual, or sets of individuals, as is here attempted. That the lands of one citizen may be taken under the right of eminent domain for public highways is well settled; but the right of eminent domain implies that the purpose for which it may be exercised be a public

one and not a mere private one. A 'public use' is one concerned with the whole community in which it exists, as contra distinguished from a particular individual or a number of individuals. It seems not to be allowable, therefore, to authorize private roads be laid out across the land of unwilling parties by an exercise of eminent domain."

In Brazos River Conservation & R. District v. Costello, 135 Tex. 307, 143 S.W.2d 577 (1940), the Court said:

"The history of the many laws enacted by the Legislature of this State relating to the exercise of eminent domain clearly shows that it is the policy of the Legislature to liberalize the exercise of that power, rather than to restrict it . . ."

This case involved the constitutionality of the statutes authorizing creation of conservation and reclamation districts. This statute was held constitutional, the Court relying on Article 16, Section 59, of the Texas Constitution, this provision being adopted in 1917.

The Court cited Subdivision (b) of this constitutional provision as follows:

"That conservation and reclamation districts are to have such powers of government and with the authority to exercise such rights, privileges and functions . . . as may be conferred by law."

In Housing Authority of the City of Dallas v. Higginbothom, 135 Tex. 158, 143 S.W.2d 79 (1940), it appears that the Texas Court has perhaps adopted a broader view of what is a public use so as to include elements of "public benefit" or "public advantage". In this case the Court sustained the validity of the Texas Housing Authorities Law, Article 1269k, which authorized the taking of private land for the purpose of building low-rent housing units. The contention was made that the statute was unconstitutional as it constituted a taking of private property not for public use within the meaning of Article 1, Section 17; that the construction would not be for the public generally, but for only a selected few low-income groups of individuals. It was held, however, that the purpose for which the land was

being taken was constitutional. It is not clear in the decision whether it was held that the land was being taken for a "public use" or a use which would be of a public "benefit". The Court did conclude, however, "We are thoroughly convinced that the use to which the housing projects will be devoted is a public one." In its opinion the Court stated:

> "We have cited the above Texas cases to illustrate the trend of the decisions in this jurisdiction in the determination of what is a public use. A review of the cited cases from our jurisdiction demonstrates that this Court has adopted a liberal view concerning what is or what is not a public use."

In Atwood v. Willacy County Navigation District, 271 S.W.2d 137 (Tex.Civ.App. 1954, error ref'd n.r.e.), appeal dism'd 76 S.Ct. 66, the validity of the statutes authorizing the condemnation of private property in the development of port areas was before the courts. It was contended that the act was unconstitutional in that it permitted the taking of land to be rented or leased to individuals. In refuting this claim, the Court stated:

> "We hold that the acquisition of land for the purpose of leasing the same as industrial sites in the proximity of a port is reasonably necessary to the successful operation of such port. Such use comes well within the definition of 'public use' as laid down in the case of Housing Authority of the City of Dallas v. Higginbothom, 135 Tex. 158, 143 S.W.2d 79. . . . Our holding is likewise supported by the Federal decision." Citing cases.

It was also held in this decision that the taking of the land in question was authorized under Article 16, Section 59, which authorizes the creation of such navigation districts.

The above cases involved primarily whether the taking was a "public use" or a "private use" under Article 1, Section 17, and the 14th Amendment. In considering the validity of the proposed Act, the provisions of Article 16, Section 59(a) must also be considered. It is an elementary rule of construction that all parts of the constitution, and statutes, are to be construed together so as to give effect to each part. That oil, gas, water and soil are natural resources is unquestioned. It is believed that the great bulk of the natural resources are privately owned and are subject to use of

the individual citizen in his capacity as an individual. The Constitution
directs that private property not be taken except for a public use, the
Constitution also directs that the Legislature conserve natural resources,
making no distinction as to the ownership, public or private, of the natural
resources.

The Courts have had little difficulty in upholding the use of
eminent domain in aid of irrigation and drainage problems. A number of
states have constitutional provisions relating to the use of land in connec-
tion with the development of natural resources. As observed by the Idaho
Court in Potlatch v. Peterson. 12 Idaho 769, 88 Pac. 426 (1906)·

> "In Idaho, owing to the contour of the country . . . and
> also owing to the arid condition of the State, the necessity
> for irrigation in the development of the State's agricultural
> resources and in the development of its boundless mineral
> wealth, it was considered a necessity to the complete develop-
> ment of the material resources of the State to enlarge and
> broaden the power of eminent domain in the State, hence the
> adoption of said Section 14, Article 1, of our Constitution. In
> many of the State Constitutions, the right to exercise the power
> of eminent domain is made to depend upon the question of whe-
> ther the use contemplated is or is not a public use in the most
> narrow and restricted meaning of the phrase 'public use'. The
> decision under many State Constitutions, therefore, are of lit-
> tle value as precedents for cases arising under constitutions
> like Idaho, Colorado, and other western States, which make
> the character (emphasis added) of the use, whether strictly
> public or otherwise, the criterion of the right to exercise the
> power."

Although it may be said that this statement was dictum since
the Court held that the use contemplated by the condemnor was in a strict
sense a public use, this observation is believed to be valid in those States
having a constitutional provision similar to the Texas constitutional provi-
sion. Article 16, Section 59(a).

The Courts have had little difficulty in upholding the use of
eminent domain in aid of irrigation. drainage. spur tracks to private plants,
private roads and logging roads, used in connection with the development
of natural resources. In Strickland v. Highland Boy Gold Mining Company,

200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581 (1906), a condemnation of a right of way for an aerial bucket line was upheld against a claim that it was taking property for private use. The Utah statute permitted the right of eminent domain for such purpose to aid in mining. In Clark v. Nash, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085, the problem involved was the constitutionality of a Utah statute which permitted the condemnation of land for the irrigation of other lands belonging to a private person. Such a purpose had been declared as a permitted use of eminent domain by the statutes of Utah, and the Utah Court had upheld condemnation for such purpose. The U.S. Supreme Court affirmed the Utah Court's holding. In Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896), the Supreme Court affirmed a California decision which had held that irrigation of arid lands was in accordance with California statute which stated this to be a public purpose. The Supreme Court stated, ". . . that the fact that the water is limited to the one landowner is not a fatal objection to the legislation."

In Clark v. Nash, supra, in discussing public use in connection with one individual having the right to condemn for an irrigation ditch for the condemnor's sole benefit, the Court stated:

"This Court has stated that what is a public use may frequently and largely depend upon the facts surrounding the subject, and we have said that the people of a State, as also its courts, must in the nature of things be more familiar with such facts and with a necessity and occasion for the irrigation of land, than can anyone be who is a stranger to the soil of the State, and that such knowledge and familiarity must have their due weight with the State Courts. . . . We are, however, as we have said, disposed to agree with the Utah Court with regard to the validity of the State statute, which provides, under the circumstances stated in the act for the condemnation of the land of one individual for the purpose of allowing another individual to obtain water from a stream in which he has an interest, to irrigate his land, which otherwise would remain absolutely valueless. . . . But we do not desire to be understood by this decision as approving of the broad proposition that private property may be taken in all cases where the taking may promote the public interest and tend to develop the natural resources of the State. We simply say that in this particular case, and upon the facts stated in the finding of the Court, having reference to the conditions

already stated, we are of the opinion that the use is a public
one, although the taking of the right of way is for the purpose
simply of thereby obtaining the water for an individual, where
it is absolutely necessary to enable him to make any use what-
ever of his land, and which will be valuable and fertile only if
water can be obtained."

Many States have enacted statutes regulating many phases of the
oil and gas industry. These statutes have been attacked as permitting the
taking of private property without due process of law, among other unconsti-
tutional grounds alleged. Almost without exception, these statutes have been
sustained, where the stated purpose has been to conserve natural resources
and a reasonable relation has been found between the stated purpose and the
method which the Legislature prescribed to achieve such result.

In Brown v. Humble Oil & Refining Company, 126 Tex. 296,
83 S.W.2d 935, 87 S.W.2d 1069 (1935), the Texas Supreme Court, in uphold-
ing the spacing rule, stated, "Section 59(a), Article 16, of the Texas Consti-
tution, directs the Legislature to do whatever is necessary for the conserva-
tion of natural resources. The Legislature has undertaken to comply with
this provision of the Constitution. Therefore, the Railroad Commission
acting under valid laws, has ample authority, under both the Constitution
and the police power to prevent waste and conserve the mineral interests
of this State. This rule is supported by a host of authorities." Citing cases.

That the U. S. Supreme Court will uphold the State Legislature
and State Supreme Court in its determination of what is or what is not neces-
sary in the conservation of its natural resources is evident in the case of
Railroad Commission v. Rowan & Nichols Oil Company, 310 U.S. 573, 60
S.Ct. 1021, 84 L.Ed. 1368, amended 311 U.S. 614, 61 S.Ct. 66, 85 L.Ed. 473
(1940). In this case the Plaintiff appealed from an order of the Railroad
Commission setting the allowable for the East Texas Field on a per-well
basis. The Plaintiff complained of the order, saying that it was denying him
an opportunity to produce his oil, and that his oil would be drained and taken
by adjoining leases; that his uncompensated drainage was an unconstitutional
confiscation of his property. This order was upheld, the Supreme Court
stating, " . . . but such cases are only episodes in the evolution of adjust-
ments among private interests and in reconciliation of all these private
interests with the underlying public interest in such a vital source of energy
for our days as oil."

The Railroad Commission has power to shut down completely all production from an oil and gas field, if necessary, to prevent waste and conserve natural resources. Railroad Commission v. Sterling Oil & Refining Company, 147 Tex. 547, 218 S.W.2d 415 (1949). The city ordinance prohibiting the drilling of but one well to a city block is constitutional and does not violate the due process clause. Marrs v. City of Oxford, 32 F.2d 134, (CA-8, 1929, cert. denied 280 U.S. 573).

In Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941 (1944), the Court set aside an allowable order for the McElroy Field in West Texas. The Court sustained, however, the power of the Railroad Commission to prescribe an allowable order, but held that such an order was not reasonable under the circumstances there presented. In discussing Article 16, Section 59(a), of the Constitution, the Court stated that the Legislature must act under this provision of the Constitution in relation to the other provisions of the Constitution, which are above discussed.

In many of these decisions regulating oil and gas, the effect has been to restrict the use to which the gas has been put; the amount of production; the number and location of wells and in some situations there has been a complete denial of a right to drill a well. All of these regulations have restricted the free and unfettered use and control of private property, and in a sense is a "taking of property". That these regulations and enforcement of conservation measures are for the benefit of the public at large is well settled. Bandini Petroleum Company v. Superior Court, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136 (1931).

The Texas Legislature, in accordance with Article 16, Section 59(a), has directed the creation of water conservation districts, navigation districts, and have passed other acts for the conservation of water and soil. The Legislature has also passed statutes whose purpose has been to conserve oil and gas. Apparently this act is the first instance where the Legislature has proposed that one natural resource be utilized to capture and make available another natural resource for the purpose of the better utilization and conservation of still another natural resource, the soil. That the State has an interest in the conservation of all natural resources is beyond question. In our opinion such act is within the constitutional provisions of Article 16, Section 59(a), and will not constitute a taking of private property for a purely private use in violation of Article 1, Section 17, and the 14th Amendment. If the State Court upholds a particular use as not being violative of the "taking" provisions of its own statute, the U. S. Supreme Court will accept this as not

being violative of the 14th Amendment. Hairston v. Danville & W. Ry. Co., 208 U.S. 598, 28 S.Ct. 331, 52 L.Ed. 637 (1908). Here the Court stated, "No case is recalled where this Court has condemned as a violation of the 14th Amendment a taking upheld by the State Court as a taking for public uses in conformity with its laws."

In our opinion the proposed act satisfies the procedural requirements of Article 1, Section 19, relating to the taking of property by due process. The act provides for a hearing before the designated administrative body for a determination of the necessity of the taking, and the terms and conditions thereof if such is deemed necessary for the conservation of water and soil. The decision of this administrative body can be appealed to the Court for a judicial review of its action. This satisfies the constitutional requirement. Voght v. Bexar County, 23 S.W. 1045 (Tex.Civ.App. 1893, error ref'd.).

In our opinion the proposed act does not violate Article 1, Section 16, relating to impairment of contracts. The proposed act does not seek to act directly upon any particular contract, touching contracts only incidentally. Henderson Company v. Thompson, 57 S.Ct. 447, 300 U.S. 258, 81 L.Ed. 632 (1937). In this case the statute prohibited the use of sweet gas for the manufacture of carbon black. The Plaintiff contended, among other things, that it impaired the obligation of a contract in which he was a party to buy and to sell sweet gas for the prohibited use; however, the statute was sustained as being constitutional.

In our opinion the provision permitting those who are using the surface to have a right to demand a portion of the gas produced from the same surface is a reasonable classification. This group has been found by the Legislature, if enacted, to encompass a sufficiently large group to aid in the conservation of soil. This is not an unreasonable classification as to those who may require gas and as to those who must supply gas as to make the act unconstitutional. Fort Worth & D. C. Ry. Co. v. Welch, 183 S.W.2d 730 (Tex.Civ.App. 1944, error ref'd).

The proposed legislation would not be an unwarranted interference with interstate commerce. Cities Service Gas Company v. Peerless Oil & Gas Company, 203 Okla. 35, 220 P.2d 279 (1950), affirmed 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 156 (1950).

An act similar to the proposed legislation was enacted in Oklahoma in 1955. A principal difference between the Oklahoma act and

the proposed legislation is that in Oklahoma it was declared that such natural gas should be made available for such use in preference to any other use, there being no restriction as to the amount which could be taken by the surface operator. The Texas act limits the amount of gas which the surface operator may demand and buy to one-eighth of that produced, and then the Railroad Commission is to determine controversies as to the necessity for such gas. Although this appears to be a material distinction, this was not the reason given in the two decisions in which this statute has been before the Courts.

In Phillips Petroleum Company v. Corporation Commission of Oklahoma, decided by the Oklahoma Supreme Court on November 20, 1956, Volume 27, "The Journal", 1921 (not yet officially reported), the Oklahoma Court held the act to be unconstitutional. Three Justices dissented. In this case Phillips contended that the act converted it into a public utility in violation of the due process clause of the State and Federal Constitutions. The Oklahoma act expressly provided to the contrary, that the gas producer was not to be considered a public utility. But the Court held that the effect of the act was to require Phillips "to engage in a field of service not heretofore performed in an area not heretofore served. We consider it immaterial that the service is limited to a small area and a few people." The Oklahoma Court also held that this constituted an unauthorized taking of property which was accomplished without eminent domain. As of the date of this Opinion, an application for rehearing is pending in the Oklahoma Supreme Court.

The same act was before the Court in Phillips Petroleum Company v. Ray C. Jones, et al., 147 Fed.Supp. 122, (D.C. Okla. 1955). The Court which heard this case was a three justice district court. The Federal Court held that the act complained of was constitutional. At the time this decision was written, the Oklahoma Supreme Court had not yet written its decision. The Federal Court stated:

"Beyond question, the act's basic objective lies within the pale of local police power authority. Nothing is more universally recognized than the right which adheres the State to conserve, protect and develop its resources for the people's general welfare and prosperity . . . to achieve this end, the enjoyment of individual property rights may be curtailed, or in some instances completely denied. In the act before us, the Oklahoma Legislature has summoned one subterranean natural resource to assist in the capture of another critically

needed subsurface mineral for the use and benefit of the
State's agricultural economy; and, if the act is given the
construction, discussed previously, it does not unconsti-
tutionally deprive a property without due process, impair
contractual rights, burden interstate commerce, or deprive
of equal protection of the laws. Inasmuch as the act is not
unconstitutional on its face, and since we cannot speculate
as to how it will be enforced in each individual case, our
inquiry is at an end."

We have examined the Oklahoma Constitution, including amend-
ments thereto through 1955. No provisions similar to the conservation pro-
vision (Sec. 16, Art. 59(a) ) of the Texas Constitution could be found. It is
therefore assumed that the Oklahoma Legislature does not have the consti-
tutional powers in this regard as does the Texas Legislature.

In summary, the Texas Constitution prohibits a taking of private
property except for public use. By inference, and the courts have so held,
the Constitution prohibits the taking of private property for the private use
of another individual. The question always present is whether the new use
(after the condemnation) will be a public use or a private use. As stated,
the Courts in the various States are in conflict as to what is and what is not
a public use, an exact definition being impossible. The final determination
of this question is a judicial matter, and is not alone a matter of legislative
determination. A review of the Texas decisions shows that the earlier
Texas Courts were reluctant to define "public use" to mean a use which
would have a public advantage or a public benefit when it was being used by
an individual in his individual capacity as the new owner. The more recent
Texas Supreme Court decisions appear to be adopting elements of "public
advantage", "public convenience" or "public benefit" in its judicial defini-
tion of "public use".

Also, Article 16, Section 59(a) of the Texas Constitution expressly
provides that the "preservation and conservation of all such natural resources
of the State are each and all hereby declared public rights and duties." In
addition, that the use of all property, including property rights in water, oil,
gas and the land itself, is subject to the police power of the State is well settled.
Hudson County Water Company v. McCarter, 209 U.S. 349, 28 S.Ct. 529, 52
L.Ed. 828 (1908); Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475 (1934).

Requiring a mineral operator to sell gas to a surface operator is a "taking" of property. In view of the later Texas Supreme Court definitions of "public use", the express provisions of the Constitution declaring conservation of natural resources to be "public rights and duties" and the police power of the State to regulate the use of all types of property, we conclude that the proposed legislation is constitutional.

## SUMMARY

Senate Bill 101, with the new Committee Substitute, is, in our opinion, constitutional.

Very truly yours,

WILL WILSON
Attorney General

By *Edwin P. Horner*

Edwin P. Horner
Assistant

EPH:tlw

APPROVED:

OPINION COMMITTEE
H. Grady Chandler, Chairman